## McLANE v. SPENCE, Adm'r.

1. An executor or administrator having an interest in the estate may purchase at his own sale, provided it is fairly conducted; if not, it may be set aside by creditors or legatees, but is not a nullity.

2, Where one as the executor or administrator of two estates, becomes possessed of the property of both, as he cannot sue himself, he will be presumed to retain what is due from one, to the other, whether it be a debt or unliquidated damages.

3, S being administrator of the estates of K and C, elected to consider certain slaves, which C, being the former representative of the estate of K, had purchased at his own sale, as the property of the estate of K, by hiring them out, as such, and in various other modes. The slaves having been sold under execution against the estate of K, S brought an action against the officers for a trespass upon the estate of C : *Held*, that as he had elected to consider the slaves as the property of the estate of K, he could not afterwards insist they were the property of C, as he had merely done what a court of chancery would have directed, if application had been made to it to set aside the purchase made by C.

Error to the Circuit Court of Talladega.

Trespass *vi et armis*, for taking and carrying away two slaves.

From a bill of exceptions taken in the cause on the trial, it appears—That one William King died and left a will, by which he appointed his wife and one John C. Calhoun, as his executors, who qualified as such, and took upon themselves the burden of the administration of the estate; the latter being a minor—That

the estate of King was largely indebted, and that J. C. Calhoun caused a sale to be made of the personal estate of his testator, at which he put up and sold in one lot, and purchased himself, twelve slaves, consisting of a man and his wife and ten children; That he never executed any bond or note for the slaves so purchased, nor made any return thereof to the county court, but carried them home, he living with his mother, Mrs. King, and worked them as his own—that the slaves were sold at a lower rate than they would have brought if sold in separate lots, or singly.

That J. C. Calhoun afterwards died, and Mrs King being removed from her office of executor, D. A. Griffin, sheriff of Talladega county, became *ex officio* administrator, *cum testamento annexo* of King, and also administrator of Calhoun's estate, and received from Mrs King the negroes purchased by Calhoun, and hired them out; and shortly after going out of office, both estates devolved on the defendant in error, as the successor of Griffin in the sheriffalty, who received the negroes in controversy, and hired them out—That one McCartney, who had obtained a judgment against the administrator of King, caused it to be levied on the slaves in controversy, by the plaintiff in error, as coroner, and sold them for its satisfaction.

That the defendant in error, after this sale, reported both the estate of King, and that of Calhoun, insolvent—that in his report he credited the estate of King with the hire of the negroes, and returned as one of the debts due by King's estate, the balance due on two judgments of McCartney, under which the slaves in controversy had been sold, after deducting the amount of the sale.— The defendant justified under this sale.

In the progress of the trial, the plaintiff was permitted to prove by a witness, that he had advised J. C. Calhoun, that he might pay the debts due by his testator, and save the family of negroes he had bought, to which the defendant objected; but the court permitted the testimony to go to the jury to repel the presumption of fraud in the purchase of the slaves; to which the plaintiff excepted.

The defendant's counsel moved the court to charge, that if said Calhoun put up the twelve slaves in one lot, with the intention of buying them in himself at an under value, and did so purchase them, it would vitiate the sale. This charge the court refused, and instructed the jury, that the purchase under such cir-

cumstances would be good unless made with the intent to delay, hinder and defraud creditors.

The defendant also moved the court to charge, that if Calhoun knew of the indebtedness of his testator, and was at the time he gave his official bond, and made the sale, an infant, that if he gave no note or security for the property purchased by him, and had no visible means to enable him to pay for it, that such sale did not change the title of the property, and exempt it from sale for the debts of King. This the court refused, and charged, that if the sale was fair—if Calhoun took possession of the property as his own, and continued to act as executor after he became of age, and ratified his former acts, it was not necessary for him to give any other security for his purchase than was afforded by his official bond.

The defendant further moved the court to charge, that if the jury believed that Spence had returned in his inventory the amount for which the negroes were hired out, as part of King's estate, and in his report of the insolvency of King's estate, had credited the demand of McCartney with the amount for which the slaves had sold, the jury might consider it a recognition or affirmance of the sale, and in that event he could not recover; which the court refused. To all which the defendant excepted.

Judgment being rendered for the plaintiff, the defendant prosecutes this writ, and assigns for error the charges of the court, and the refusals to charge as set out in the bill of exceptions.

W. P. CHILTON, for plaintiff in error—contended, that the purchase by the executor at his own sale, was void. [4 Dess. 504; 1 Hawk. 497; 24 Law. Lib. 190; 11 Vesey, 226; 10 id. 426; 6 id. 627; 8 id. 398.]

The executor can acquire no title by a breach of the trust.

WHITE, contra.

ORMOND, J.—In Brannan v. Oliver, [2 Stewart, 47,] it was held by this court, that a purchase by an administrator at his own sale, was not void, but was prima facie valid, and would be supported if no unfairness appeared. This decision is explained in Saltmarsh v. Beene, [4 Porter, 283,] to be confined to that class of trustees, having an interest in the property so purchased.

In this case it appears, that the executor purchased a lot of slaves, twelve in number, at his own sale—that they were put up in one lot, and purchased by him for less than they would have sold, if sold separately—that he made no return to the orphans' court, of sale, nor executed any note for the purchase money with surety, but converted the slaves to his own use.

We think it clear, that this sale could not be supported if contested by legatees or creditors, but upon a proper proceeding, would have been set aside, and a re-sale ordered. Nor would it avail to validate the sale, for the executor to show, if in his power, that he did not intend by his purchase to defraud the creditors of the estate. To support a purchase by an executor or administrator at his own sale, there must be no unfairness; the property must be exposed to sale in the usual and ordinary mode, and under such circumstances as to command the best price. In this case, the sale of twelve slaves in one lot, many of whom were grown, was directly calculated, if it was not intended to enable the executor to buy them in at an under value; and although it would doubtless be proper to sell husband and wife, or parent and small children together, it could not be tolerated that twelve slaves, most of whom were grown, should be sold in one lot, thereby diminishing the range of purchasers, and the prospect of obtaining a fair price; the result of which was in this case, that the slaves were bought in below their value. The creditors and legatees have also a right to the security afforded by such sales to strangers, and if this is omitted to be afforded, they are prejudiced by the purchase by a representative of the estate.

But, however irregular and voidable such a sale may be, it is not a nullity. The title would pass to the purchaser until divested by a proceeding against the executor, having that for its object. Although the sale may be irregular, until it is set aside, the purchase money is assets of the estate in the hands of the executor, and it results necessarily, that the slaves could not be also, assets of the estate—such being the fact, if there was nothing else in the case, as the estate of King had no property in the slaves at the time of the levy by the coroner, the levy was illegal, and he would be answerable to the representative of Calhoun's estate. There is, however, another important fact disclosed in the case, which changes its aspect entirely.

Upon the death of Calhoun, Spence, as sheriff of the county,

113

became *ex officio*, the legal representative, both of his estate and that of King, and as such, received the assets of both. It became necessary for him to determine whether the slaves purchased by Calhoun at his own sale, were his property or the property of King's estate, and it appears that he elected to consider them as the property of the latter. This is demonstrated by his acts, showing most unequivocally, that he did not consider the estate of Calhoun entitled to the property. He hired out the slaves as the property of King's estate, and after the sale made by the coroner, of the same slaves, to satisfy a judgment obtained against him as the representation of King's estate, he reported to the orphans' court, the balance of the judgment not satisfied by the sale, as the debt due the judgment creditor, on reporting King's estate insolvent.

He had the undoubted right to consider the property as belonging to the estate of King, and to treat it as such, if justified by the facts of the case, and if the same result would have been produced by a proceeding in equity, to set aside the sale; as it cannot be doubted that a party may do that voluntarily, which a court of equity will compel him to do, and from the previous examination, it appears that he did precisely what a court of equity would have directed, upon a proceeding to set aside the sale and purchase made by Calhoun. He is, therefore, estopped by his own act, from saying, that the slaves sold by the coroner, were not assets of King's estate. It would be the grossest injustice, to permit him to treat the slaves as the property of the estate of King, until they are seized and sold for the payment of its debts, and then claim them as belonging to the estate of Calhoun.

The principle upon which this portion of the case rests, was the ground of the decision in Draughon v. French's adm'r, [4 Porter, 352]—that where one becomes possessed of two estates, as the legal representative of both, as he cannot sue himself, he will be presumed to retain what is due from one to the other, whether it be a debt, or unliquidated damages.

Without, therefore, examining the other questions raised upon the record, it follows from the view here taken, that the court erred in the refusal to give the third charge moved for by the defendant.

The other charges of the court affirming the validity of the purchase by Calhoun, unless there was an express intention

found by the jury to defraud creditors, were wrong in point of law, and although to a certain extent abstract, yet its direct tendency was to mislead the jury, by placing the decision upon a question not material to the inquiry before them. Let the judgment be reversed, and the cause remanded.