# WILLIAMSON v. BRANCH BANK AT MOBILE.

1. Where an executor qualifies in Virginia, and there under the will takes possession of slaves, charged with a legacy, which he afterwards removes to this State, and there is no evidence of what are the laws of Virginia, the common law must be looked to, in order to ascertain the nature of the executor's title, and whether a purchaser from the executor can resist the claim of the legatee, to charge the slaves with her legacy.

2. When property is received by a foreign executor abroad, and it is afterwards remitted here, an administrator appointed here, cannot assert a claim to it here, against the person in whose hands it may be, or against the foreign executor.

3. A foreign executor, &c., is chargeable in this State for all the assets which he retains in his hands, or which he has disposed of, out of the course of his administration; and the legatee has the right here, to pursue the assets of the estate, so long as they continue to be held by the executor, or his personal representative.

4. Although an executor is invested with the absolute power to dispose of the personal estate of his testator, yet he can make no valid sale or pledge of the assets as a security for, or in payment of his own debt.

5. As between the executor and his immediate creditor, assets of the testator, may be seized and sold under execution, whenever there has been a devastavit; and when the executor has so dealt with the assets, as to be responsible for a devastavit, or has used them in a manner inconsistent with his trust, he cannot prevent his creditor from seizing them under an execution.

6. Where an executor holds assets in accordance with the trusts of the will, he may prevent a sale of them, when levied on for his own debts, by interposing a claim under the statute, and possibly by a bill in equity; but if the executor permits a sale to be made, it is a devastavit, and the purchaser under the sheriff cannot be said to be in collusion with the executor. [Opinion of GOLDTHWAITE, J. not concurred in by the other Judges.]

7. A creditor, or legatee, has the right to pursue the assets of an estate, whenever there is reason to apprehend their misapplication by the executor, either voluntarily, or by coercion of execution, in satisfaction of his own debts.

8. Where slaves of an estate upon which the executor administered in Virginia, were removed to this State, where for some years he had used them as his own, he being also the residuary legatee; which slaves were chargeable with the payment of a legacy of ten thousand dollars, and were levied on by the sheriff in this State for the debt of the executor—the legatee cannot pursue them in the hands of the purchaser, although notice was given at the sheriff's sale, of the claim, and that it would be enforced against the slaves. [Opinion of GOLPTHWAITE, J. not concurred in by the Court.]

9. Notice given at the time of a sheriff's sale of an unextinguished equity, is suffi-
cient to charge a purchaser, and in this respect there is no distinction between
sheriffs and other sales. [ORMOND, J. delivering opinion of the majority of the
Court.]

Writ of error to the Court of Chancery for the —— district
of the southern division.

THE case made by the bill is this : In September, 1836,
William Chamberlayne, of the State of Virginia, then posses-
sed of real and personal estates, died, having first made and
published his last will and testament, by which, after some
two or three other bequests and devises, he made the follow-
ing : "I give and bequeath to my niece," the complainant, "the
sum of six hundred dollars annually, to be paid by my execu-
tor, commencing five years from the day of my death; which
said sum is to be applied to the best use, in his judgment, to
promote her comfort and convenience. Should my said niece
survive her husband, and prefer the sum of ten thousand dol-
lars to said annuity, then my executor is required to pay the
said sum in four annual instalments, the first payable in twelve
months from her election. Should Samuel Williamson sur-
vive his wife," the complainant, "and she leave a child, or
children, then my executor is in like manner constituted trus-
tee to such child or children, and shall apply said annuity to
the support of such child or children, till he, or they, arrive at
the age of twenty-one years; and that in four annual payments
he pay the said sum of ten thousand dollars, intended to have
been paid to their mother, to such child, or children, in four
annual payments." "I now give and bequeath to my belov-
ed nephew," the defendant, Mosby, "all the rest and remain-
der of my estate, both real and personal in this State," (Vir-
ginia,) or "elsewhere, to him and his heirs forever. I lastly con-
stitute and appoint my said nephew my whole and sole execu-
tor ; and as there cannot be a reasonable doubt of my solven-
cy, I request that he may not be required to give security as
my executor." In a previous part of the will, is found this
clause : "I wish my executor to keep my estate together four
years, and manage it as he may think best, to raise the fund,
together with all money that may be due, or owing to me, for
the payment of such debts as he shall be satisfied are legal and

just; and at the end of that term he will deliver over to each legatee his legacy. And in twelve months thereafter, commence paying to, or for the use and benefit of, my niece," the complainant, " the annuity hereafter bequeathed to her during her coverture; and my executor is charged not to let one cent go into said Samuel Williamson's" (her husband) "hands, except such as he may apply to the purchase of provisions for the use and support of the said Elizabeth," (the complainant,) "and her children." At the bottom of the will, is a memorandum, signed by the testator; he directs that if his niece dies before her husband, and her child, or children, before they arrive at twenty-one years of age, his executor is released from the payment of the legacy.

This will is without witnesses, and was admitted to probate in the proper Court of Ordinary, in Virginia, on the 8th September, 1836, when letters testamentary were granted to the defendant, Mosby, upon his giving his own bond, without any security.

Under the letters testamentary, thus granted, Mosby took possession of the testator's estate, and the bill charges that all the debts and other legacies have been paid by Mosby, but that the one to the complainant has never been paid, in any manner, although payment has frequently been urged and requested.

Thirty slaves of the testator's estate, whose names are set out, were brought by Mosby to the State of Alabama, without the consent of the complainant, where, in Sumter county, on the 9th day of May, 1842, they were levied on, by the sheriff of Sumter county, and sold as the property of Mosby, to satisfy his own proper debts, and not for any for which he was liable as the executor of the testator. These slaves were purchased by the defendant, Sheppard. These slaves are charged to have been, at the time of the sale, and purchase by Sheppard, assets in the hands of Mosby, as executor, and subject to the payment of the legacy bequeathed to the complainant, and were not subject to the proper debts of the said Mosby, until the payment of that legacy. It is also charged that Sheppard was informed at the sale, that this legacy was unpaid—that the slaves were subject its payment, and would be pursued into the hands of the purchaser. It is also charged, that

Mosby and Sheppard are insolvent, and that there is reason to apprehend the latter intends removing the slaves out of the State.

The prayer is, that Sheppard may be restrained from moving the slaves out of the State, and for such relief as may be proper, under the circumstances of the case.

Sheppard answers the bill, and states his ignorance of the will of Chamberlayne, and calls for proof. He insists, that Mosby came to this State in 1836 or '37, possessed of a large number of slaves, upon which he obtained credit, as their ostensible owner; that a large sum of money was due from him to the Branch Bank of the State of Alabama at Mobile, for debts contracted on the credit of the property thus in his possession, and that, as the agent of this Bank, he made the purchases charged in the bill. He admits that notice was given at the sale, of the non-payment of the legacy, and that the complainant intended to pursue them into the hands of the purchaser, but he insists, that this was only part of a fraudulent contrivance to secure the property, and prevent it from being appropriated to the discharge of the debts of Mosby. A variety of facts are detailed to support this allegation, but it is unnecessary to state them here, as no evidence was taken to sustain this point of the answer.

A supplemental bill was filed afterwards, making the Branch Bank of Mobile a party, and alledging another sale by execution, at which thirty slaves were sold, and purchased by the Bank, under like information and notice.

Testimony was taken by the complainant, which identifies the slaves sold as having been owned, or as being the issue of those owned by the testator. That Mosby removed from Virginia in 1837, bringing the slaves with him, and that ever since they have remained in his possession, until the sale under sundry executions against him individually. The will was established by the production of a properly certified copy of the probate. No evidence was taken by the defendants.

By agreement between the parties, the answer of Sheppard was to be considered as the answer also of the Bank, and it was agreed also, that the will had never been recorded in any Court in Alabama.

The Chancellor considered, that the slaves purchased for, or

by the Bank, were subject to the complainant's lien for the legacy, bequeathed to her by the testator's will, and decreed that they were so subject, but allowed the Bank to elect to hold the slaves, securing the legacy according to the terms of the bequest.

This decree is now sought to be reversed.

F. S. LYON, for the plaintiffs in error, made the following points:

1. If the will operated as a lien upon the slaves, it should have been recorded in Sumter county.  [Clay's Digest, 255; Swift v. Fitzhugh, 9 Porter, 39.]

2. The complainant, as a pecuniary legatee, has no right to subject the slaves, against a purchaser for a valuable consideration, without showing fraud, collusion, or misconduct between him and the executor..  [1 Lomax on Ex. 346; Hall v. Sampson, 7 Vesey, 152; 17 Vesey, 16; 14 Ib. 355; Field v. Scheffelin, 7 John. Ch. Rep. 150; Sutherland v. Brush, 7 John. Ch. 17; 9 Cowen, 320; 2 Rand. 294; 3 Ib. 195; 4 Porter, 27; 1 Lomax on Ex. 346; Whale v. Booth, 4 T. R. 625.]

3. There is no equality or equity in pursuing the slaves purchased by the Bank, when the property unsold, and that purchased by others at the sale, was equally liable to the legacy. [1 Story Eq. 778; 1 Vern. 455; Amb. 614; 9 Ves. 209.]

4. There is no proof that the slaves mentioned in the supplemental bill, ever belonged to the estate of Chamberlayne, and none showing that they are subject to the complainant's legacy.

HOPKINS and REAVIS, contra, insisted—

1. That in order to protect the claimant's rights, it was unnecessary for the will to be recorded.  The statute only relates to cases where there is a contract, by which the title is in one person and the possession in another.  It presumes the incumbrance to be created by the party owning the property, and the instrument creating the incumbrance to be in the power of the parties beneficially interested.  [Swift v. Fitzhugh, 9 Porter, 37.]  Here the instrument was neither in the power of the legatee or of the executor, (1 Rev. Code of Vir. 381, § 27,) and our statute does not authorize the registration of a copy.

2. The slaves were not liable to be taken for the executor's debts until the debts and legacies were paid. [4 Term, 621; 1 B. & P. 293; 17 Ves. 152; 5 Ala. Rep. 523.]

3. So far from the slaves being liable to be taken for the executor's debts, if he had made an actual sale or mortgage of them to the Bank, and that had notice at the time of the complainant's equity, the slaves would still be chargeable with the legacy. [4 Porter, 27; 4 Dess. 522; 17 Vesey, 152; 1 Cox, 320; 11 S. & R. 377; 2 Rand. 290; 12 Wheat. 498.]

4. The second section of the statute of frauds, (Clay's Dig. 255,) relates to conveyances and wills made in this State only. This is evident from the mode of proof and registration required. [13 Pet. 107; Crenshaw v. Anthony, Mar. & Yerg. 110.]

5. There is a wide difference between a sale made by an executor, of the testator's assets, in payment of his own debt, and a sale of them under an execution, to pay his own creditor. In the first, having the legal title, he voluntarily parts with it, committing a devastavit without the connivance of the creditor; in the other, if he is not consenting to the sale, the effect of it would be, that the law will permit a creditor of the executor to waste the estate, without being responsible to any one. The case of Whale v. Booth is determined on the ground, that the creditor did not know that there were debts of the estate unpaid, and that the executor had made a bill of sale.

6. Mosby stands in an attitude different from that of executor merely; he is constituted, by the will, a trustee, to hold the legacy for the complainant's separate use, and there is no rule more firmly established, than that a purchaser of trust property shall be held to account for it.

7. There is no proof that any one but the Bank or its agents purchased, but if there was, this would not make it necessary to make such purchasers parties. [Story Eq. Plead. 197, § 228.] The rule of contribution has no application between wrong-doers, as between whom there is no privity.

8. The slaves named in the supplemental bill were properly charged, as the agreement refers the answer of Sheppard to that, as well as the original bill.

9. The notice of the complainant's lien, is sufficient, if given before the purchase. [4 Porter, 27; 10 John. 458; 4 Wheat. 266; 9 John. 163.]

10. The legacy is a charge on the assets. [2 V. & B. 378; Ward on Leg. 206.]

GOLDTHWAITE, J.—1. In the consideration of this case, it is material to take into view the fact, that the will was executed in Virginia, where probate was granted ; and where the executor, who is also the residuary legatee, obtained possession of the slaves now sought to be charged, and which were subsequently removed by the executor to this State, when they were taken in execution to satisfy his individual debts. It is also material to advert to the circumstance, that there is no evidence in the case showing what the laws of Virginia are, with respect to the powers and duties of an executor ; if they vary in any manner from the rules ascertained by the common law. In this condition of the case, it seems evident to me, we must look to the common law, and not to our own statutes, to ascertain what is the nature of the title by which the executor acquired these slaves; and whether, under the circumstances of this case, the purchaser of the slaves can equitably resist the claim of the complainant, to charge them with her legacy.

2. I say, it seems evident, that we must look to the common law, independent of our own legislation, because it is well settled, that if property is received by a foreign executor or administrator abroad, and it is afterwards remitted here, an administrator appointed here cannot assert a claim to it here, either against the person in whose hands it might happen to be, or against the foreign executor, or administrator. [Story Conf. Laws, 434, § 518; 432, § 516.]

3. Though this is considered as well settled, and indeed depends on a maxim of very general acceptation, to wit : that the *state* or condition of property accompanies it every where, yet it by no means follows, as asserted by some decisions, (Story Conf. Laws, 422, § 513, and cases there cited,) that a foreign administrator can only be sued in the limits of the country which made the grant of administration. On the contrary, it has been held by Courts of high authority, that such an executor is chargeable in any country where he is found, for all the assets which he retains in his hands, or which he has, in that country, disposed of, out of the course of his

administration.	[Swearingen's exr's. v. Pendleton's exr's, 4 S.
& R. 389; Evans v. Tatum, 9 Ib. 252 ; Campbell v. Tansey,
7 Cowen, 64.]	To this effect also, is the decision of our own
Court, in Calhoun v. King, 5 Ala. Rep. 623.	In that case, a
foreign administrator had removed a portion of the assets of
the estate here, when he died.	After administration of his
estate was granted, his administrator was enjoined at the suit
of a distributee of the foreign estate, from selling assets of that
estate which come to his hands under the administration; and
it was further decided, that those assets could be distributed
here under a Court of equity, notwithstanding the administra-
tion and possession of it in another State.

In view of these decisions, it may be considered as estab-
lished, that the complainant is entitled to pursue the assets of
the estate, so long as they continue to be held by the executor,
or his personal representative, and that in this aspect, the case
is not affected by the removal of the assets into another juris-
diction.

4.  Beyond this, it seems now to be the constant doctrine of
the English Courts of equity, that although an executor is in-
vested, with the general and absolute power to dispose of the
personal estate of his testator, yet, generally speaking, he can
make no valid sale, or pledge of the assets, as a security for, or
in payment of his own debts.	[Williams on Ex. 612, and ca-
ses there cited.]	Sir John Leach, in Keane v. Drummond, 4
Madd. 332, thus states what appears to be the result of all the
cases :	"Every person who acquires personal assets by a
breach of trust, or devastavit in the executor, is responsible
to those who are entitled under the will, if he is a party to the
breach of trust.	Generally speaking, he does not become a
party to the breach of trust by buying, or receiving, as a pledge,
for money advanced to the executor at the time, any part of
the personal assets, whether specifically given by the will or
otherwise : because this sale, or pledge, is held to be *prima
facie* consistent with the duty of an executor.	Generally
speaking, he does become a party to the breach of trust, by
buying, or receiving in pledge, any part of the personal assets,
not for money advanced at the time, but in satisfaction of his
private debt, because this sale, or pledge, is *prima facie* incon-
sistent with the duty of an executor."	He says, he prefaces

115

both those propositions with the terms, "generally speaking," because they both seem to admit of exceptions. It is also very clear, that whenever there is such collusion between the executor and the person in possession of the assets, as will render the dealing between them invalid, creditors and legatees, whether general or specific, are entitled to follow the assets. [Hill v. Simpson, 7 Vesey, 152; McLeod v. Drummond, 17 Vesey, 169.] And the rule has been extended so as to include an administrator *de bonis non*. [Cubbidge v. Boatwright, 1 Russ. 549.] Whether, and how far delay to enforce these rights, within a reasonable time, will operate as a bar, need not at present be considered.

5. It will be perceived, that the Bank does not stand in the attitude of a purchaser from the executor, but is a purchaser under a sale, made by the sheriff, by virtue of sundry executions against the executor individually. The authorities, therefore, which have been examined, do not bear upon the case, if the sheriff, under the executions in his hands, was authorized to convey the title to these slaves: or unless the purchaser can be charged as being in collusion with the executor in causing a *devastavit* of the assets, by reason of the notice given by the complainant at the sale. If the sale by the sheriff was illegal, and conveyed no title to the purchaser, as the complainant insists here, was the case, it being shown that her legacy remained unpaid; there would, in my judgment, be an end of the controversy; because we have already ascertained, that as assets of the estate, the slaves would be chargeable with, and subject to the payment of complainant's legacy.

The cases at law bearing upon the question of the authority of the sheriff to levy and sell, are Whale v. Booth, 3 Doug. 36, S. C. very imperfectly reported in a note, 4 Term 625; Farr v. Newnham, 4 Term 621; Quick v. Staines, 1 B. & B. 293; Gaskill v. Marshall, 5 C. & P. 31, and Fenwick v. Laycock, 2 A. & E. N. S. 108. The four first of these cases, were actions against sheriffs for false returns; or for seizing or converting personal effects. The last is the interposition of a claim by a trustee, under a recent act of Parliament, and is in the nature of our claim suits. In Whale v. Booth, the sheriff had seized goods of the testator upon an execution against the executor individually, and turned them over to a trustee

Williamson v. Branch Bank at Mobile.

of the creditor upon an inventory; at the same time he exe-
cuted a bill of sale. The creditor knew that some of the
goods were parcel of the estate and effects of the testator.
The goods were put in the possession of one Mansfield, and
the executor came to live in his family as a servant of the cred-
itor. The plaintiff having obtained an execution against the
goods of the testator in the executor's hands to be administer-
ed, caused the same goods to be seized; but the defendant re-
turned the execution *nulla bona*, under the impression that
the property in the goods was divested by the previous sale.
The question was, whether the executor had so far conveyed
the goods of his testator, as to deprive the plaintiff of his right
to levy on them. Lord Mansfield conceded, that the executor
might have defeated the seizure by the sheriff; but as he did
not, he consented to the execution and sale; and the case could
not, as he said, be distinguished from an alienation by the ex-
ecutor. The bill of sale acquiesced in by the executor, is the
same thing as a direct sale by him. The sale by the sheriff
was accordingly held good. Farr v. Newnham, was a ques-
tion, whether, after a levy upon assets of the testator for sat-
isfaction of a debt of the executor, the sheriff was warranted
in giving precedence to an execution, afterwards placed in his
hands, against the goods of the testator. The Court, three
Judges against Judge Buller, held, that he was thus warranted.
In Quick v. Staines, the executrix, for three months from the
death of her testator, had used the goods as her own, and then
married; after which, the husband and wife used the goods as
their own. They were levied on and sold as the goods of the
husband. He and his wife afterwards sued the sheriff in tro-
ver for the conversion, but the Court of Common Pleas held,
that after a *devastavit* he could not be permitted to set up the
claim of his wife as executrix. In this case, only nine months
had elapsed between the testator's death and the suit against
the sheriff. It seems, at first, to have been considered, that
the case of Farr v. Newnham was inconsistent with that of
Whale v. Booth, though two of the three Judges gave the lat-
ter case their express assent. This seems also to have been
the opinion of Lord Eldon, who, in McLeod v. Drummond,
17 Vesey, 154, says, he is not prepared to follow Lord Mans-
field even to that extent, and even insists, that the opinion of

the Judges in Farr v. Newnham, could not be squared with equitable notions. Afterwards, however, in the same case, he says, that the decision of Lord Mansfield, as that of a Court of law, may be considered as general doctrine. Gaskill v. Marshall was an action of trespass against a sheriff for selling goods which the plaintiff had in his possession as administrator. The only proof of a *devastavit* was, that the administrator had removed with his wife to a house occupied by the intestate before his death, in which was the furniture, for seizing which the suit was brought. Lord Tenterden thought, that the plaintiff had not been so long in possession, as to make these goods his own. Three months only had elapsed; but the Judge said, that it might be otherwise, if the possession had continued for a very long time. In Fenwick v. Laycock, the defendant in execution was in possession of goods as the trustee of another; and although his possession had continued for a long time, it was consistent with the terms of the trust. Lord Denman held, that the goods were not subject to the levy, and laid some stress upon the possession being necessary for the execution of the trust.

When these cases are exhibited at one view, it seems evident to me, they do not conflict: and the supposed inconsistency between the two principal cases, in the opinion of Lord Eldon, may have been caused by the imperfect note of Whale v. Booth, in Term Reports. Conceding, however, the utmost weight to his remarks, with reference to that case, they amount only to the expression of difference of opinion, in which the matter to be decided by him was not involved. It may be remarked, too, that in the case before him there were circumstances of collusion between the executor and creditor, which possibly ought to have weight in a Court of Chancery. The general doctrine is distinctly admitted in all the cases cited, that as between the executor and his individual creditor, assets of the testator may be seized and sold under execution, whenever there has been a *devastavit*. It is impossible, not to see, that there must be a time when the goods held by an executor, may be chargeable with his individual debts. Preston, in treating of the conveyance of a term by an executor, says, that it is difficult to ascertain when the character of executor or administrator ceases, and the ownership, independent of

that character, commences. Every case must depend upon its own circumstances: this only is certain, that when the executor or administrator ceases to hold, in that character, he will hold the same in his own right, and the estate will then be subject to merger. [3 Preston on Con. 316.]

The case of Ray v. Ray, Coop. 264, decided by Sir Thomas Plumer in 1815, is very similar in principle to that now before .us. There, an executor had renewed a term in his own name. This term was levied-on by his individual creditor; and then a creditor of his testator filed a bill, praying for an injunction, and that the term might be made subject to his demand. The will was proved in March, 1809, and the bill filed in April, 1815, but it is not stated when the lease was renewed. The Court considered, that a debt contracted upon the credit of having property in possession for six or seven years, without any demand to enforce the constructive lien, had at least, an equal, if not superior, equity, to a creditor lying by, until the seizure of the goods under execution. And he accordingly dissolved the injunction, so far as it interfered, to prevent the sheriff from proceeding to sell. To me, these cases are satisfactory to show, that whenever the executor has so dealt with the assets, as to be responsible for a *devastavit*, or has used them in a manner inconsistent with his trust, that he cannot prevent his creditor from seizing them in execution.

6. It is difficult to suppose a more clear case of *devastavit* in an executor, than his permitting the estate committed to his charge to be sold for the payment of his own debts; and if he does so permit, it is entirely equivalent, so far as the common law is concerned, to a sale by himself. A creditor has the right to pursue the assets, when the executor, contrary to his trust, has converted them to his own use, and in doing so he cannot be said to be in collusion with him.

I entertain no doubt whatever, as to the right and capacity of an executor who holds the assets of an estate, in accordance with the trusts of the will, to prevent a sale of them when levied upon, by interposing a claim under the statute, and possibly too, by bill in equity. It deserves consideration also, whether, in a case where there had been no *devastavit*, or undue delay in the administration of the assets, the sheriff

or plaintiff in execution might not be responsible to the executor in his representative character.

7. The cases already examined, as well as others which we cite, show, that a creditor or legatee has the right to pursue the assets, whenever there is reason to apprehend their misapplication by the executor, either voluntarily or by the coercion of an execution, in satisfaction of his own debts; and that in all that class of litigation, it would be a proper subject of inquiry. between the parties claiming to subject the property, whether the one or the other had the paramount equity. The cases of Pistole v. Street, 5 Porter, 64, and Wier v. Davis, 5 Ala. Rep. 442, show, that neither the creditor nor the administrator himself can reach assets at law, when they have been sold by the administrator, although such a selling may in itself be a *devastavit* The decisions in Whale v. Booth, Quick v. Staines, and Ray v. Ray, before cited, are also conclusive to show that, by the common law, the property is altered by a sale under execution, and assets thus sold cannot be reached by a creditor of the testator in the hands of a purchaser at the sheriff's sale, if he is innocent of collusion with the executor. My own conclusion on this point of the case is, that under the circumstances disclosed by the bill, the slaves were *prima facie* liable to seizure upon executions against the defendant, Mosby, individually, and that a purchaser at the sheriff's sale, if unaffected by fraud or collusion, was invested with the absolute title, by virtue of such sale.

8. I shall now examine the case with reference to the supposed liability, on account either of an actual or constructive collusion. Actual collusion with the executor is not asserted by the bill, or disclosed by the answer or evidence. It is not even stated in the bill, that the executions under which the sales were made, were at the suit of the Bank. The answer, it is true, sets out the purchase and assignment of various judgments, the executions upon which were supposed to have a preference of lien, in consequence of being first in the sheriff's hands, and the evidence discloses a sale under various executions, to the amount of $22,454. The charge of collusion therefore, rests entirely upon the circumstance, that at the time when the sheriff was about to sell, notice was given to the persons then attending, of the fact, that the complainant's legacy

was unpaid, and that purchasers would be held responsible. It is difficult to conceive that such a proceeding as this could have any other effect than to invite and encourage fraud. If her claim was available as against the several creditors, no reason is shown why it was not interposed in such a manner as to enable them to contest its validity; and it is equally difficult to assign a satisfactory reason why she should prefer to pursue a great number of purchasers, at the risk and hazard attendant upon such a suit, in preference to proceeding at once against the executor, before the levy, or against him and the creditors, after the seizure, but before the sale. To me it seems obvious, if such a notice can affect the purchaser, with notice of a constructive lien, that the sale of the slaves, instead of being in some degree under the control of the parties to the execution would have been entirely so, under that of the complainant. A purchaser satisfactory to herself, would meet with no impediment, whilst one who was not so, would reap a law suit, as the only result of his investment. The inevitable consequences of giving effect to such a notice in this case, would be, either to delay, hinder, or defraud the creditors, who must now be presumed as rightfully pursuing their demands, or to enable her to nominate a purchaser at her own price. Even in cases where, in consequence of a collusive purchase from an executor, the sale would, under ordinary circumstances, be set aside, a waiver has been presumed from lapse of time. [Elliot v. Merriman, 2 Atk. 41; McLeod v. Drummond, 17 Vesey 162; Ray v. Ray, Coop. 264.] Here in addition, the fact that all other debts and legacies are asserted by the bill to have been paid, the property is removed into another State, where it remains for nearly five years, and even when levied on, no claim is interposed by the executor, in his representative character, nor any proceedings taken by the complainant to assert her claim to charge the assets. Under these circumstances, if the suit was now to restrain a creditor of the executor, from proceeding, to me it would be difficult to arrive at a conclusion, that his equity was inferior to that of the complainant, after such delay. But when the creditor has been suffered to proceed, without one legal impediment, with the levy and sale, I think it is too late then to affect a purchaser with notice of a

claim which should have been asserted against the creditor, who alone is competent to litigate it.

My judgment leads me to the conclusion, that the bill discloses no substantial equity, and ought to be dismissed, but my brothers attain a different result, which they will announce.

ORMOND, J.—I agree with my brother GOLDTHWAITE, in the positions advanced in this case, except so far as he maintains, that the equitable lien of the complainant was lost, by her omission to assert it by a suit in Chancery, before a sale of the slaves.   I understand the doctrine to be well settled, that a purchaser, with notice of an existing equity, takes subject to such equity, and I know of no case which holds that there is any difference as to this point, between a purchaser at private sale, or a purchaser under execution, or at any other public sale. If there be notice before the purchase is consummated, the purchaser is affected by it, and will take the property subject to the *lien* or equity.    This is a familiar principle of Courts of Equity, which it is scarcely necessary to cite authority to sustain, and which has been recognized by this Court.   [Swoope v. Trotter, 4 Porter, 27;  Hall v. Click, 5 Ala. Rep. 363.]

Nor is there any *laches*, or delay, imputable to the complainant.   The will was made and became operative in September, 1836.   The bill was filed 10th May, 1842, so that the first annuity was just payable when the bill was filed.   It is true, if the executor was about wasting the estate, so as to endanger the annuity, she might have filed a bill *quia timet*, but there is no evidence that she knew the executor was becoming involved, or that her legacy was about being put in hazard. The case of Aston v. Galloway, et al. 4 Iredell Law & Eq., on Eq. side, 126, is a strong case in point.   There, a testator devised land, charged with the payment of a legacy, which was afterwards purchased by Galloway, with notice of the equity, and retained possession for twelve years, when he died, and his executors, under a power in his will, sold to another.   A bill was filed against the executors of Galloway, and the last purchaser, and the Court decreed payment of the legacy, from Galloway's executors, although at the time of filing the bill, there wanted but three days of the time when the statute of limitations would operate as a bar to relief.

The executor had a clear legal title in the slaves, and that title, (charged with the payment of this annuity, and subject to the payment of ten thousand dollars to the legatee, if she survived her husband, and so elected,) was liable to sale, for the payment of his debts. In this aspect, this case is materially different from that of Ray v. Ray, Cooper's Rep. 264. The ground of that decision is the long delay of the creditor of the deceased, in permitting the executor to retain and use the property as his own, and during the interval, about seven years, the executor had changed the character of the property, (a leasehold of the estate,) by renewing the lease in his own name. Under these circumstances the Court considered the equity of the creditor of the executor, equal, if not superior, to that of the creditor of the deceased, and refused to interfere to prevent a sale of the property for the executor's debts.

In this case there has been no delay—the first instalment of the annuity was not long due when the sale was made, and all that could be reasonably required of the complainant, was to give notice as soon as the slaves were levied on, of her equitable lien. The difficulty which appears to have pressed upon my brother is, that if notice merely was sufficient, it would enable the complainant, by creating doubts about the title, to nominate her own purchaser, and thus covertly, either herself, or through the medium of another, to buy in the property, at a reduced price. But we cannot assume that such was her intention, or that such would be the necessary consequence of her acting, and there can be no doubt that such a design consummated, would be a fraud upon the creditors, which could be reached in this Court.

If, indeed, she had filed a bill to prevent the sale, it must have been upon the allegation that her legacy was thereby endangered, and that object can as well be accomplished now, that by the sale the Bank has become the owner of the property, with notice of her rights, as it could have been before the sale. Certainly the Bank is in as good a condition now, as it would have been then; as it cannot be supposed that the notice of the *lien* could have had any other result than to affect the value of the property, in all probability, at least to the extent of the *lien*.

I am not able to perceive that the complainant has been

116

guilty of any laches which could either prejudice her rights, or injuriously affect the rights of the creditors of Mosby, and the Bank having purchased with full notice of her equitable *lien*, must take the property subject thereto.

The decree of the Chancellor should therefore be affirmed.

COLLIER, C. J.—It may be conceded, so far as this case is concerned, that an executor may so act in respect to the estate of his testator, as to subject it to levy and sale for the payment of his individual debts. Without stopping to consider what the law is upon this point, I am satisfied that the complainant had an equitable lien upon the estate of the testator for the payment of the legacy, bequeathed her by his will. I have considered the argument of my brother GOLDTHWAITE, and acknowledge its force, yet I find myself unable to concur in the conclusion, that the complainant, by failing to invoke legal coercion before the sale was made under the execution of the Bank, lost her lien upon the property sold. In general it may be necessary for a *cestui que trust* to protect his rights against one proposing to purchase *bona fide*, and for a valuable consideration; but if one purchases with notice, he cannot hold the property divested of the trust. He will not occupy a more favorable position than the trustee, but will be treated as such. The complainant is a married woman, and it is not perhaps altogether certain, that even a notice would be necessary for the protection of her interest. But be this as it may, if she has given notice, her rights are unaffected by the sale. I am therefore of opinion that the decree should be affirmed.