## COLBERT vs. DANIEL.

[BILL IN EQUITY BY LEGATEE AGAINST EXECUTOR.]

1. *Executor not chargeable with devastavit at suit of legatee who concurred in it.*
   Where an executor, acting upon an erroneous construction of the testator's
   will, which he, in common with all the legatees, honestly believed to be the
   true construction, allotted a share of the slaves to the widow,—*held*, that a
   legatee, who was present at and assented to the allotment, could not hold
   the executor liable as for a *devastavit.*

2. *What is assets in the hands of executor.*—Where the testator, having a life-
   estate in certain slaves, purchased an interest in the remainder, and took
   the conveyance in the name of his children, his executor is not chargeable
   with the hire of the slaves after the termination of the life estate.

3. *Husband's interest in wife's personal property in possession.*—If a widow, having
   a life estate in slaves, marries a second time, her interest vests in her hus-
   band at common law; and on his death, living his wife, is assets in the
   hands of his executor.

4. *Estoppel en pais.*—Mere silence, or an omission to assert one's right, does not
   constitute an estoppel, when resulting from ignorance of that right.

5. *Construction of will as to advancements.*—A provision in a will, executed several
   years before the testator's death, directing that his elder children, then at

school, should account for the moneys that might be advanced for their education, does not render them liable for moneys advanced by the testator himself in his lifetime.

6. *Debts chargeable equally on legacies.*—Where no fund is provided for the payment of debts, each legatee is bound to contribute ratably to their discharge.

7. *Express trusts not affected by statute of limitations or laches.*—Neither the statute of limitations, nor the doctrine of laches, can be invoked by an executor to shield himself from an account for property held under an express and acknowledged trust.

8. *Jurisdiction of equity over foreign executors.*—A foreign executor, who, without making a settlement of his trust, has removed to this State, and become domiciled here, may be sued by a legatee in the chancery courts of this State, for an account and settlement of his administration and the recovery of a legacy.

9. *When legatees or their personal representatives are necessary parties.*—When a legatee files a bill against a foreign executor, who has removed to this State without settling his trust, seeking an account and settlement and the recovery of a legacy, all the other legatees who are interested in the fund are necessary parties to the bill; and if any one of them has died, his personal representative must be brought before the court, or a sufficient excuse for the omission must be shown.

10. *Effect of non-joinder of parties.*—The chancellor should not dismiss a bill on final hearing, on account of the non-joinder of necessary parties, without affording the plaintiff an opportunity to amend.

APPEAL from the Chancery Court of Barbour.

Heard before the Hon. WADE KEYES.

THE material facts of this case may be thus stated:

In the year 1800, Levi Daniel died in Talbot county, Georgia, the place of his residence, leaving a widow (Martha) and three children (James L., Catherine, and Juliet) him surviving, and having executed his last will and testament, which contained a clause in these words: "I lend to my wife, during her natural life, the following negroes," (nine in number, which are designated by name;) "and after my wife's decease, it is my will and desire, that the said negroes be equally divided between my three children hereinafter named." Mrs. Martha Daniel, the widow, soon afterwards married John Daniel, also a citizen of Georgia; and the nine negroes above referred to went into their possession under the will. Catherine Daniel, one of the testator's daughters, married Julius C. B. Mitchell; and Juliet, the other daughter, married Warren Jordan; but at what particular time

these marriages took place does not appear. In 1823, John Daniel purchased from Mitchell and Jordan, for valuable consideration, the respective interests of their wives in these nine negroes, which are called in this case "the dower negroes;" and took the conveyances in the names of his children. In 1827, John Daniel died, in Georgia, the place of his residence; leaving his widow, (Martha) and their six children, to-wit, Mary, Caroline, Elizabeth, Levi L., John W., and Benjamin F., surviving him; and having executed his last will and testament, dated the 25th November, 1821, which contained the following provisions:

"It is my will and desire, that all the negroes of which I may die possessed, together with every other species of personal property, should be kept together upon my two plantations for the mutual benefit of my wife and children, unless it may be thought best, by the person on whom the execution of this will may devolve, to rent out one of my plantations, and work all my hands on the other; and it is further my desire, that both my said plantations should be kept in good repair for cropping, whether rented or not, and that the particular profits arising from crops shall be applied to the use of my wife, and the raising and educating of my children, share and share alike. It is my will and desire, also, that when my wife marries, or any of my children arrive at the age of twenty-one or marry, they, or either of them, upon the happening of such event, shall be entitled to a distributive share of my whole personal estate; and should it suit the convenience of my children, after receiving a share of my personal estate as above mentioned, they shall be at liberty to work their hands on any part of my lands, rent free. It is my will, also, that if the produce of hands and plantation, by renting or cropping, should be more than sufficient for the maintenance and education of my family, such surplus money shall be put to interest, or laid out for such property as will most advance the welfare of my family. It is further my will, that my real estate shall not be divided, until my youngest child arrives at full age or marries. It is my particular will and desire, also, that

neither my real nor personal estate shall vest in my children, until they arrive at the age of twenty-one years or marry; after the happening of either one of which events, it is my will and desire, that an equal portion of my real and personal estate shall be vested in them, their heirs and assigns forever.   My will further is, that what money may or shall be advanced to the education and improvement of my elder children, now at school, shall be considered as part of their moiety of my estate, and they shall all account for the same to the managers of my estate."

This will was duly admitted to probate in Hancock county, Georgia; and letters testamentary were granted by said court to James L. Daniel, the executor named in the will, who thereupon qualified, and entered on the duties of the trust.   The slaves which were in the possession of said John Daniel, at the time of his death, were the nine negroes above referred to, in which his wife had a life estate under the will of her first husband, together with their increase, and others which belonged to him individually in his own right.   Mary, the eldest daughter of said John Daniel, afterwards married Joseph T. Dismukes, and, on his death, Larkin Colbert; Elizabeth married one Joseph P. McCulloch, and Caroline married one Persons.   The slaves in which Mrs. Martha Daniel, the widow, had a life estate under the will of her first husband, were allowed by the executor, with the concurrence of all the legatees, or at least without objection on their part, to remain in her possession until her death, which occurred in 1842.   In 1829, on the marriage of Dismukes with complainant Mary, the executor allotted to her a distributive share of the slaves and other personal property to which she was entitled under her father's will, not including the slaves in which the widow had a life estate; and similar allotments were made to the other children, as they respectively became of lawful age or married.   A distributive share of the slaves was also allotted by the executor to the widow, under an erroneous construction of the will, which was adopted by him in

common with all the legatees. These slaves were brought by Mrs. Daniel into this State, on her removal to Barbour county; and, on her death in 1842, were bequeathed by her to her younger sons, John W. and Benjamin F., who died before the commencement of this suit. James L. Daniel, the executor, also removed to Barbour county in this State, without having made a final settlement of his executorship.

On these facts, in November, 1843, Mrs. Colbert and her husband filed their bill in equity, in the chancery court of Barbour county, against the said James L. Daniel and others; seeking to make the said James L. Daniel, as executor, account for (1st) "one-sixth part of the annual hire of the life-estate negroes, from the death of John Daniel in 1827, to the death of Mrs. Martha Daniel in 1842;" 2d, "for one-sixth of two-thirds of said negroes in remainder;" 3d, "for the same proportion of the hire of said negroes since 1842;" 4th, "for one-sixth of the negroes allotted by him to Mrs. Daniel, as her share of the estate of said John Daniel;" 5th, "for the same proportion of the hire of said last-mentioned negroes;" and, 6th, for the same proportion of the proceeds of certain lands in Georgia, and of the value of a slave which was not included in the executor's inventory, for which it was alleged he had never accounted. Mitchell and wife, Jordan, McCulloch and wife, Levi L. Daniel and Caroline Persons, were made defendants to the bill; and it was alleged that Mrs. Juliet Jordan, John W. Daniel, and Benjamin F. Daniel were dead, and that no letters of administration had been granted on the estates of the two latter.

The defendants severally answered the bill, but their answers are not set out in the record; a "brief" of the several answers being substituted by consent. The points of defense relied on will be readily understood from the opinion of the court.

On final hearing, on pleadings and proof, the chancellor dismissed the bill; and his decree is now assigned as error.

Wm. P. Chilton, with whom was L. L. Cato, for the appellants, made these points:

1. The record shows that James L. Daniel, the executor of John Daniel, has never fully settled with the court of ordinary in Georgia. The case presented by the record, then, is that of a distributee going into chancery for an account against an executor, alleging waste of assets by him, and showing that he has never fully accounted. The jurisdiction of the court is fully sustained by the case of Julian v. Reynolds, 8 Ala. 680.

2. The sixty slaves, called the "dower negroes" in the bill, which were bequeathed by the will of Levi Daniel to his wife for life, with remainder to his three children, vested in John Daniel, on his marriage with the widow, for the life of his wife, both at common law, and under the Georgia statute; and, on his death, passed to James L. Daniel, his executor, as assets of his estate. The executor is chargeable with the hire of these slaves, from 1827, when his testator died, until 1842, when the widow also died.

3. The defense set up to this claim, that the complainant consented to the widow's use and possession of these slaves, is not sustained by the proof. There was no agreement between the complainant and the executor, to the effect that the widow should have the property for life. If there was no effort, it only proves the complainant's leniency, and that she was biding her time to call him to an account. Her acquiescence in her mother's possession of the slaves is no bar to her claim. She had no right to the property, nor to the hire, except through the executor; and her right to hold him to an account was not forfeited by any thing shown in the proof. Moreover, the executor returned these slaves as belonging to his testator's estate, and, in 1838, less than six years before the filing of the bill, returned the hire of a portion of them as assets of the estate. The attempt to explain away this return fails altogether. It is shown, also, that the widow paid debts of the estate out of the proceeds of the hire of these slaves; proving that she knew they belonged to the estate.

4. The complainant's "acquiescence," as the witnesses call it, in the possession of the widow, is sufficiently explained by her ignorance of the fact that the life estate of the widow passed to her second husband. Her admissions, made under such circumstances, and founded upon such mistaken views of her rights, could not be received to prejudice her claim.

5. The statute of limitations does not bar an account with the executor of John Daniel, against whom the complainant here proceeds. Conceding that the widow's possession continued long enough to perfect her title to the hire of "the dower negroes," and to give her an absolute title to "the John Daniel negroes;" yet the fact that the executor has been so faithless as to permit a title to be acquired against the estate by his neglect, renders him liable. This was a clear *devastavit* on his part. The slaves thus disposed of by him are, in effect, unadministered assets, which might be recovered by an administrator *de bonis non*. The executor being estopped from suing for them by his own acts, the legal remedy is not barred, because there was no one who could sue.—Lawson v. Lay, 24 Ala. 184; Hopper v. Steele, 18 Ala.

6. It is shown that John Daniel in his life-time purchased an interest of two-thirds in "the dower negroes," taking the assignment to his children; and it appears, also, that his executor had these slaves in possession, at and after, as well as before, the death of the widow. The executor is certainly responsible for the hire of these slaves, as also is Levi L. Daniel, who must have received them from the executor. As to these matters, no demand before suit brought was necessary.

7. At the division of "the dower negroes," to which the complainant was neither a party nor privy, a portion of them were distributed to the heirs of Jordan and Mitchell, from whom John Daniel had bought their interest for his children. This was a clear conversion, which renders those engaged in it liable to the complainant, for her share of the slaves, with their hire.

8. If the proper parties were not before the court, that was no ground for dismissing the bill. The case

should have been ordered to stand over, that the proper parties might have been brought in.—1 Danl. Ch. Pr. 334, 336, and notes; Miller v. McCan, 7 Paige, 452.

JAMES L. PUGH, and JEFF. BUFORD, *contra:*

1. Martha Daniel was allowed to hold the life-estate negroes under the will of her former husband, and not as part of the estate of which respondent was executor. It was conceded that the executor of John Daniel, in his official character, had no right to the possession of these negroes. The effect of the complainant's acquiescence, ignorance, consent, omission, or sanction, (as it is variously termed by the witnesses,) was to induce the executor not to regard it as his duty to take possession of these negroes as a part of the estate of John Daniel. The respondent never had possession of these negroes in his official capacity. The breach of duty, for which it is sought to make him liable, is his failure to take them into his possession as his executor; and in reference to this matter, the complainant can have no relief, because she induced the conduct of which she complains. Mere silence, founded in ignorance of one's rights, may not constitute an estoppel; but an express concurrence in the wrongful act of another, by which that wrongful act was partly induced, certainly precludes the concurring party from complaining. The maxim applies, *volenti non fit injuria.*—Harrison v. Pool, 16 Ala. 175; 1 Greenleaf on Ev. § 197; 23 Ala. 255; 18 Ala. 514; 7 Ala. 246; 8 Por. 95; 1 Story's Eq. 128–51; 1 Wendell, 583; 14 Ala. 532; 7 Pick. 278; 5 Pick. 469, 477.

2. The statute of limitations constitutes a complete bar to the relief sought.—8 Por. 218; 5 Ala. 90; 3 Ala. 762; 2 Por. 76; 3 Bro. Ch. 633.

3. Equity will not grant relief in case of stale demands, though the statutory bar be inapplicable or incomplete. Johnson v. Johnson, 5 Ala. 86; 3 Ala. 762; 18 Ala. 50, 62; 3 Rand. 117; 4 Rand. 454; 1 Russ. and My. 236; 2 Moll. 157; 3 J. J. Mar. 15; 1 John. Ch. 370; 9 Ala. 663; 13 Ala. 246; 1 Ala. 650; 17 Ala. 472; 2 Por. 58; 2 How. (U. S.) Rep. 234; 5 Porter, 345.

4. The bill was defective for want of proper parties, and was properly dismissed for that reason.—Story's Eq. Pl. §§ 63, 72, 75, 76; 4 Ala. 350; 5 Ala. 179; Reavis' Digest, 298; 10 Ala. 703; 16 Ala. 625; 15 Ala. 91; 2 Por. 351; 4 Por. 66; 20 Ala. 477; 1 Smith's Ch. Pr. 203, 512, 515; Story's Eq. Pl. §§ 354,. 618, 626, 829.

5. The chancery courts of this State have no jurisdiction to compel an account and final settlement by a foreign executor.—Worthy v. Lyon, 18 Ala. 784; Julian v. Reynolds, 8 Ala. 680.

WALKER, J.—The slaves, which were allotted by the executor of the last will and testament of John Daniel, deceased, to the decedent's widow, Martha Daniel, were by the widow bequeathed to her younger sons, and passed into their possession upon her death, before the commencement of this suit. The complainant, therefore, cannot have a recovery from the executor of a share in the specific property. If she obtain any relief, it must be a pecuniary recovery for the *devastavit* committed by the executor. Notwithstanding it may be true that, under the will of John Daniel, the widow was entitled to a share of the personalty only in the contingency of her marriage, which never occurred, the complainant cannot hold the executor responsible for the unauthorized allotment to her of such share. This controlling position upon one point in this case is based upon the applicability to the complainant, in reference to the executor's wrongful act, of the maxim, " *Volenti non fit injuria*." The meaning of this maxim is, that one who consents to an injury, cannot be heard to complain of it. This maxim was adopted and applied by this court in the two decisions made in the case of Crutchfield v. Houston, 14 Ala. 49; 22 Ala. 83. In a case reported in 1 Beavan, 126, (Booth v. Booth,) it was held, that a *cestui que trust*, who concurs with a trustee in a breach of trust, is liable to indemnify the trustee. The principle above stated was applied in Waring v. Purcell, 1 Hill's (S. C.) Ch. 202, where a question arose similar to that which is presented in this case. An executrix, by the consent of her co-executor, who was also interested in

the estate, delivered a bond due to the testator to a third person, because it was believed that the testator intended to give, and was prevented by sudden death from giving, the bond to such person. The executor afterwards, in a chancery suit, attempted to make the executrix responsible for the bond, because he thought he had discovered there was a mistake as to the testator's intention to give the bond. Chancellor Dessausure decided against the complainant; remarking, that "it was not for him to insist that his co-executor should bring into her account of the estate a bond transferred with his approbation." The court of appeals affirmed that decision, and said, that the act done was the complainant's own act, for he consented to, and approved it; and as to the defendant, the complainant was concluded by the maxim, *volenti non fit injuria*."—See, also, the case of Jackson v. Inabnit, 2 Hill's Ch. 411; Cowan and Wife v. Jones, 27 Ala. 324.

If the executor's wrongful allotment of a share of the slaves of John Daniel's estate was made with the consent of the complainant, her complaint of that act will not be regarded by the court. It is clearly shown by the proof, that from the death of John Daniel, the unanimous opinion of all the persons provided for in the will was, that the widow took a vested legacy in an equal share of the personalty with the several children of the deceased. One witness, McCulloch, who married one of the legatees, proves that he and Dismukes, complainant's first husband, though doubting upon the subject, entertained a different opinion; but it does not appear that they ever expressed that opinion, except to each other. This construction of the will was adopted by the complainant, in common with the rest of the testator's children, and frequently expressed by her during a series of years, extending from the death of John Daniel, in 1827, until after her second marriage, in 1838. Concurring with the persons interested as beneficiaries, the executor adopted the same construction of the will. With the executor and the legatees there was an unbroken assent to such a construction of the will, as would give to the widow a share of the personalty. To the adoption of that construction the execu-

tor thus had the consent of all the legatees, including the complainant; and he conducted his administration upon the hypothesis that such was the true construction of the will, without the interposition of an objection, or the occurrence of a complaint, until after 1838, when the complainant's second husband contended for a different construction. In 1829 or 1830, an allotment was made to the complainant and one of her sisters, of their distributive shares. At that time, the complainant and her husband were present. In ascertaining the two shares, which were separated from the *corpus* of the estate, the widow was regarded as entitled to a share; and an equal portion was left, incorporated with the residuum for her. The complainant and her husband were present, and did not object; but, in the language of the testimony, acquiesced, and accepted the allotment made to them.

In 1835, after the death of complainant's first husband, and while she was a widow, a second allotment of shares in the slaves was made. This allotment was to two of the children, and to the widow. The allotment to the widow, in 1835, could not be deemed a mere ascertainment of the share to be left undistributed as a provision for the contingency of the widow's marriage, in which event she would become entitled under the will to a share. A separate and distinct order was made by the "inferior court sitting for ordinary purposes," appointing commissioners to set apart and lay off to her a distributive share. The commissioners, in pursuance to that order, did set apart to her a share of the slaves; and those are the slaves for which the complainant seeks to charge the executor. This evidence is irresistible to show that the setting apart of the slaves was an allotment of them to her as her property, and must have been so understood by all persons who were present and knew what was done. The proof, however, further shows, that at the time of this allotment, in 1835, the widow had an intention, which was known to the complainant, to bequeath the slaves so allotted to her two youngest sons; and the allotment was made with a view to her making such a bequest. The complainant, being an adult *feme sole*, and

knowing that the slaves were to be allotted to the widow, separated from the *corpus* of the estate, and that the widow designed to bequeath them to her two sons, was present when the commissioners set apart the slaves, and made no objection, as all the witnesses who testify upon the subject prove. Some of the witnesses say, that she acquiesced. One witness says, that no objection was made by the complainant, or any other person; but there was rather an agreement to the same by all concerned, as well as he recollects. Another witness testifies, that the construction of the will, which allowed to the widow a share in the personalty, was adopted when the allotment was made, in 1835, *the complainant assenting to such a construction of the will, and consenting in the allotment to Martha Daniel of her portion of the said slaves.*

It also appears that the complainant lived, for a long time after 1835, near the widow, Martha Daniel; knew of her intention to bequeath the slaves to her two sons, (John W. and Levi Daniel,) and that she claimed them as her property; and yet the complainant uttered no complaint, and made no objection. This last named testimony corroborates the idea, that the allotment to the widow was an act to which the complainant had no objection, and, having no objection, assented to it. None of the evidence is in conflict with that which proves positively the complainant's consent to the allotment to the widow; but all of it contributes to corroborate that evidence. The witness, who proves the complainant's consent, stands in an attitude which might lead us to regard his testimony with suspicion; yet we cannot doubt its credibility as to this point, when we find it fortified by the tendency of all the other evidence in the case.

We deduce the conclusion from the foregoing survey of the evidence, first, that the complainant assented to and approved, and herself asserted, the construction of the will upon which the executor acted in making the allotment to the widow; and, secondly, that she was present and actually consented to the allotment which she now says constituted a *devastavit* by the executor. If the executor injured her by the construction which he placed upon

the will, or by the allotment which he made in pursuance to that construction, she cannot complain. The injury was done by her consent, and with her approval; and the maxim applies, *volenti non fit injuria.*

The wife of John Daniel had, at the time of her intermarriage with him, a life estate in a number of slaves, the remainder interest in which slaves belonged to her three children by a previous marriage. These slaves, with the exception of one which was disposed of, remained in the possession of John Daniel, until his death. John Daniel, after his marriage, purchased two of the shares of the remainder interest, and took conveyances thereof to his children. John Daniel left six children. The complainant claims that she was entitled, upon the death of Martha Daniel, to one-sixth of the two shares, or one-sixth of two-thirds of the remainder; and she seeks a recovery of such share of the slaves. Conceding that the complainant's right to the interest described in those slaves could be asserted in this bill, (which is by no means certain,) we must nevertheless deny to her the relief sought, because the claim has been satisfied. The answers allege, and the proof establishes, that a division of those slaves among the persons interested, upon the basis of right asserted in the bill, was had before the commencement of this suit. The complainant and her husband were notified in advance of that division; but neither of them attended. Upon that division, a full share of the slaves in value, according to complainant's interest, was allotted to her; and her share was left with her brother, for her and her husband. After the commencement of this suit, the share so allotted was accepted, and the husband of the complainant receipted for them as a full satisfaction of the share, and released all claim in reference to those slaves. The division of those slaves, having been thus ratified, approved and accepted, must be regarded as having been valid from the commencement, and the complainant can have no farther claim to a distributive share of them.

[2.] The complainant asserts a right to charge the executor with one-sixth of two-thirds of the hire of these

Colbert v. Daniel.

last named slaves, from the death of Martha Daniel until the division. The executor cannot be chargeable with that which he did not have, and to which he had no right in his capacity of executor. The executor's testator took the title to the two shares of the remainder interest in the name of his children, and not in his own. Consequently, the executor had no right to the hire of the slaves after the termination of the life estate by the death of Martha Daniel, and could not have recovered the same if he had attempted to do so, and he cannot be chargeable with such hire.

[3.] The complainant also demands by her bill a recovery from the executor of her proper share of the hire of the slaves, in which Martha Daniel had a life estate, for the period antecedent to the death of the said Martha. Before the allotment to the complainant, these slaves were worked upon the testator's plantation; and the presumption is, that the complainant, in the division, obtained her proper share of the services of those slaves prior to that time. But we cannot perceive any sufficient reason for the refusal to charge the executor with a share of the hire of those slaves, in favor of the complainant, intervening between the allotment to her, in 1829 or 1830, and the death of Martha Daniel. The life estate in the slaves according to the common law, which we must presume prevailed in Georgia, vested upon his marriage in John Daniel. There are no words in the will creating a life estate, which can have the effect of making it a separate estate in Mrs. Daniel. The life estate being vested in John Daniel, it was assets in the hands of his executor. Under the will of the testator, the complainant was clearly entitled to share equally with the other five children of John Daniel in the slaves during the life-time of Martha Daniel. This has been denied to her, and the representative of the executor is chargeable with one-sixth of the hire of such slaves, from the time of the allotment to the complainant and her husband, in 1829 or 1830, to the death of Martha Daniel.

[4.] It is contended that the executor's breach of duty, in the omission to assign to the complainant her proper

share of the life-estate slaves, was the result of a miscon-struction of the will of Levi Daniel. That will was in its terms so plain, that such a mistake in the construction of it is strange. This misconstruction of the will, upon which it is contended the executor acted, was adopted by the children of the testator. The complainant, like the rest, misconstruing the will, evidently thought her mother had a separate estate for life in these slaves, and that she herself had no interest in them until the death of the life tenant. Influenced by this mistake as to her rights, she remained silent, and did not assert them. She even asserted her mother's right to them during her life. She remained silent, too, when the allotment was made to her, and did not require that the executor should take those slaves into the account in ascertaining her share. But silence, or an omission to assert her right, resulting from an ignorance of that right, would not estop her.—Steele v. Adams, 21 Ala. 534. The maxim "*volenti non fit inju-ria*," brought to bear upon another branch of this case, does not apply here, because the proof does not show a consent on the part of the complainant to her exclusion by the executor from all participation in the life interest in the slaves; nor that the executor was induced by the complainant's act or consent to withhold the assertion of his claim as executor to the slaves. On the contrary, the evidence shows to our satisfaction, that the executor did hold the slaves in his capacity of executor.

The complainant's allegations that the slave Harry was not distributed, and that she had not received her share of the proceeds of the sale of the Jones county land, are not sustained by the proof. It is proved, that the slave Harry was distributed according to the will; and one witness swears, that, according to his recollection, the complain-ant told him that she had received her share of the Jones county lands.

[5.] The last item of the will required, that what money might or should be advanced to the education and im-provement of the testator's elder children, then at school, should be considered as a part of their "*moiety*" of the estate, and that they should account for the same to the

managers of his estate.    We do not understand this clause
of the will to mean, that the elder children should be
charged with the expenses incurred by the testator in
their education and improvement, but with the money
which might be advanced by the executor for that pur-
pose.    The will was executed about six years before the
testator's death, doubtless with the expectation of a much
earlier death than occurred.    The testator, most probably,
anticipated that the burden of meeting the immediate
and actually accruing expenses of the elder children, then
at school, would devolve upon the executor, before he
would realize any thing from the crops, the means pro-
vided for the education of the children.    The education
of the complainant ceased, and she was married, before
the testator's death; and the executor made no advance-
ment for her education or improvement.    If he paid debts
contracted by the testator in and about the complainant's
education, they stand upon the same footing with other
debts.    The will does not authorize us to charge them as
advancements against the complainant.

[6.] The complainant's share is certainly chargeable
with her proportion of the debts of the estate.    The will
provides no fund whatever for the payment of debts, and
each legatee should share equally the burden of discharg-
ing the debts.    If the complainant has received her proper
share of all that has been distributed, without contribu-
tion to the payment of the debts, her proper share of the
debts should be deducted from the sum to which she is
entitled on account of the hire of negroes as herein before
set forth.

[7.] Neither the Georgia statute of limitations, nor the
statute of limitations of this State, can avail the defendant
as a bar to a decree for the hire, with which we have
decided he is chargeable.    Nor can the doctrine of laches
be invoked for him.    The right of the complainant grows
out of a trust.    We have examined the testimony with
care; and the result of that examination is the conclusion,
that the trust was subsisting, recognized, and acknowl-
edged, until about one year before the commencement of
this suit.    The position that the executor, when he made

the first allotment in 1829 or 1830, threw off and openly repudiated the position of trustee in relation to the slaves the hire of which is here claimed, is not well taken in point of fact. These slaves were treated as a part of the estate. No distinction was made between the possession and employment of them, and of those which indisputably belonged to the estate. These slaves were appraised as a part of the estate; they labored in common with the slaves of the estate, upon the lands which belonged to it. The proceeds of their labor was blended with, and treated as a part of, the estate. They, together with the other slaves, were under the general superintendence and control of the executor in his official capacity. They were controlled by the overseers employed by the executor, and the executor charged himself, in a sworn return made to the court, with the hire of some of the slaves as late as 1838, which hire enters into a balance struck in the sworn return in favor of the estate. These circumstances lead us to the conclusion, that the trust was subsisting and acknowledged by the conduct of the executor until within a short time before the commencement of this suit. While the slaves were thus held under an acknowledged trust, neither the statute of limitations nor the doctrine of laches could operate in favor of the executor.—Pinkston v. Brewster, Solomon & Co., 14 Ala. 315; Maury v. Mason, 8 Porter, 222. We are aware that there is some proof opposed to the conclusion which we have attained; but we think it cannot weigh against the testimony upon which we decide the point.

[8.] We cannot assent to the proposition, that a legatee cannot sue in this State an executor, for an account and settlement of his administration and recovery of the legacy, when the executor has removed to and become domiciled in this State without having made a settlement in the State in which the administration was pending. We admit, that there is authority which sustains that proposition.—See Story's Conflict of Laws, § 513, 514. The question did not arise in the case of Worthy v. Lyon, 18 Ala. 784, for the executors in that case did not reside in the State of Alabama. One of them resided in Geor-

gia, where letters of administration were granted. We are not sure that the court in that case intended to go beyond the question arising, and intimate by a *dictum* that the chancery court would have no jurisdiction; but, if it had done so, we should not hesitate to depart from such a doctrine. We think that, to hold that the court has no jurisdiction in this case, might produce a total failure of justice. The representative, being resident in this State, cannot be reached by any judicial proceeding in the State from which he came. If he have sureties in the State of the administration, it must be conceded that proceedings might be had against them. But then there may be cases where there are no sureties; the sureties may be insolvent, or may have removed to another State; and a discovery from the representative of the estate may be indispensable. Besides, no adequate reason can be perceived, if there are solvent sureties who could be reached in the State of the administration, why the persons having an equitable right to an account against an executor or administrator, should be compelled to forego it, because the executor or administrator had changed his domicile to another side of the State line. This view of the question is fully sustained by the following authorities: McNamara v. Dywer, 7 Paige's Ch. R. 239; Tunstall v. Pollard, 11 Leigh, 1.

This question is left undecided in Calhoun v. King, 5 Ala. 523. The precise point was not decided in Julian v. Reynolds, 8 Ala. 680, but we think the effect of that case is to sustain the principle asserted by us.—See, also, Williamson v. Branch Bank, 7 Ala. 906.

[9.] Two of the defendants demurred to the complainant's bill, for the omission to make the representatives of B. F. and of J. W. Daniel parties, or assign a sufficient reason for that omission. B. F. and J. W. Daniel were legatees; and their representatives are entitled to shares of the hire sought to be recovered by the complainant. They died after attaining majority, and no excuse for the failure to make their representatives parties is set up, except that none have been appointed. It is settled by the decisions of this court, that the representatives of the

deceased legatees were necessary parties, unless some excuse for their omission, which the law deems sufficient, is alleged.—Bogan & Bogan v. Camp, 30 Ala. —; Frowner v. Johnson, 20 Ala. R. 477; Chapman v. Hamilton, 19 *ib.* 121; Hartley v. Bloodgood, 16 *ib.* 233; Goodman v. Benham, 16 *ib.* 625; Julian v. Reynolds, 8 *ib.* 680. The fact that there is no administration is not a sufficient excuse for the failure to make the representatives of the deceased distributees parties. It does not appear that there were no debts against their estate; and we cannot presume the absence of debts, as they were over the age of twenty-one years; and it does not appear that, if there were debts, they have been paid off. It is clear that this case comes within no exception to the general rule, that the legatees or their representatives in such a case as this must be made parties.—Vanderveer v. Alston, 16 Ala. 499; Miller v. Eatman, 11 Ala. 614; Bethea v. McCall, 5 Ala. 315.

[10.] The court, for the mere nonjoinder of parties defendant, should not have dismissed unqualifiedly without affording an opportunity to amend.—Gibbs & Labuzan v. Frost & Dickinson, 4 Ala. 720; Lucas v. Bank of Darien, 2 St. 326; Rugely v. Robinson, 10 Ala. 703; Alderson v. Harris, 12 Ala. 580; Toulmin v. Hamilton, 7 Ala. 369; Grimshaw & Brown v. Walker, 12 Ala. 107; Bloodgood v. Hartley, 16 Ala. 233.

The decree of the court below is reversed, and the cause remanded for further proceedings.