## COLBURN, ET AL. v. BROUGHTON, ET AL.

1. The bill in the case seeks relief against B as the administrator *de bonis non* of C, for trust funds received by C·in his lifetime, but not accounted for to the *cestui que trust*. It also seeks relief against B, as administrator *de bonis non*, for slaves of complainants, sold by J C, a previous administrator on the estate of C, and also against other defendants, as purchasers, of trust property at a coroner's sale: Held, that the bill is multifarious.
2. When the bill shows that some of the complainants have no interest in the object of the bill, as where an article, as slaves, is conveyed to a mother for life, with remainder to her children, and the bill seeks an account of the profits during the continuance of the life estate, the children as to this, have no interest, and are improperly joined as complainants.
3. The purchaser of trust property, at a sheriff's or coroner's sale, when it is sold as the property of another, cannot be sued in equity on the mere ground that the property is a trust estate. His title is adverse to that of the trustee, and is not subject to investigation in a court of equity, unless he claims under the trustee, or by collusion with him.
4. The mere circumstance that a trust is created on certain property, does not invest a Court of Chancery with jurisdiction to determine disputes arising with regard to the title.
5. The death of the trustee is not a circumstance to confer jurisdiction, although it might create such an equity as would warrant a bill to prevent a sale, or removal of the trust estate, until the legal title could be ascertained by suit.
6. Although, at common law, a trust on personal property passes to the administrator of the estate, yet it is subject to be severed from the administration by the appointment of a trustee, under the statute, and when so severed, the trust can never again unite with the administration.
7. The personal representative of a trustee, who held the trust estate at his death, is estopped from setting up another title to defeat that under which his intestate held.

Writ of Error to the Court of Chancery for the 5th District.

·The case made by the bill is this:

Martha J. is the wife of James F. Colburn, and the other complainants are her children by him.

On the 25th December, 1829, one John B. Bradford, by deed of that date, conveyed to Wm. C. Coolidge, since de-

ceased, certain real estate described therein, upon trust, to receive notes, profits and proceeds of the same for her life, and to her own separate use ; and in case her husband, James B. should die during her lifetime, then to convey the same to her for life, and to the heirs of her body, by said James, in remainder. The consideration expressed in this deed, is the grantor's natural love and affection to the said Martha and her children, he being her father, two thousand dollars paid by the husband, and the sum of five dollars paid by the trustee. This deed is alledged to have been admitted to probate on the day of its date, and recorded on the 17th day of April, 1830. From the deed, as exhibited, it appears to have been acknowledged before the then Judge of the County Court of Monroe county. On the 30th of December, 1829, the same Bradford conveyed to Coolidge certain slaves, to wit : Jack, about 67 years old ; Sally, about 14, and Phœbe, about 11 years old, in trust, to permit the said Martha to possess, use, and enjoy the same, during her natural life, to her own separate use, and after her death to be the absolute property of her (issue) heirs, by James B. Colburn, with full power to the trustee, with her consent, to sell, exchange, &c. the same if it should seem expedient. From the deed, as exhibited, it appears to have been acknowledged on the day of its date, before the Judge of the County Court, and recorded the 16th April, 1830. It is expressed in the deed, that the slaves were then in the possession of the husband, and the consideration is stated to be natural love and affection for the wife, and one dollar paid by the husband, as well as the trustee.

On the 25th of December, 1839, Colburn, the husband, conveyed to Coolidge certain other slaves, to wit : Lewis, about 22 years old ; Mary, about 17 ; Sukey, about 13 ; Cæsar, about 12 ; Sterling, about 11 ; Betsey, about 10 ; Lettuce, about 21 ; Lucy, about 5 ; Ned, about 3, and Juliett, about 15 months, upon trust, to permit Martha Colburn to receive the profits, hire, &c. and to permit her to use and possess the same, at all times during her natural life, to her own separate use, and to the heirs of the bodies of the said James B. and Martha, in remainder. But if they should die without heirs, then the trustee to convey to the right heirs of the husband, in such manner as he should appoint by his last

will, &c.   This deed, as exhibited, appears to have been acknowledged in the same manner as the last, and recorded 16th of April, 1830.   The consideration is expressed upon its face to be for divers good causes, and four dollars' paid by the trustee.   Coolidge is a party to each of these three deeds, having in writing accepted the trust, and covenanted faithfully to perform the duties imposed on him.   Immediately after their execution, he entered into possession of the lands and slaves so conveyed.   About 100 acres of this land was then in cultivation, and on that he put all the slaves, except Lettuce, Lucy, Ned and Juliette, which were retained by Mrs. Colburn as house servants.   Coolidge cultivated the land until August, 1835, and made crops of corn and cotton, more than sufficient for the use of the plantation.   He sold cotton every year in Mobile. and received the proceeds thereof, as well as that of the year 1839 ; all of which he applied to his own use, and never accounted for with the complainants.   The crops averaged 25 bales of cotton, worth from 1200 to $1500.

Coolidge was an intimate friend of, and resided in the family of Mrs. Colburn.   Confidence was reposed by her in his integrity and honesty, that he would account justly, but she never called on him for a settlement, and was the more inclined to waive inquiry into her affairs from his expressions of gratitude, and his often repeated declarations, of a determination to leave her children whatever property he might have.   Habits of intemperance in the latter part of his life, produced frequent indisposition, requiring from Mrs. Colburn and her family great care and attention to his wants and comforts.   No charge was made against him for board, and to the time of his death, in August, 1835, he was treated as a member of the family.

At the October term, 1835, of the Circuit Court of Monroe county, one Smith was appointed by that court as the trustee in the place of Coolidge.   Smith resigned in November, 1838.   Afterwards, on the 27th of that month, application was made to the Court for the appointment of Thomas Gailliard as trustee, who, on the 30th was appointed to act until the ensuing term of the Circuit Court, when the ap-

45

pointment might be conrmed or otherwise. Previous to the sitting of that court, the legislature divested it of jurisdiction, and the appointment being temporary, expired, leaving Mrs. Colburn without a legal trustee, to manage the trust property.

The slaves before mentioned had increased by births, and Sukey, one of them, was exchanged for another named Peter, in virtue of the power in the deeds.

Gailliard, as trustee, purchased at a sale by the sheriff, by virtue of execution against Colburn, a barouche and two horses, with trust money belonging to Mrs. Colburn.

The father of Colburn, in January, 1839, addressed a letter to the trustee, Gailliard, inclosing a note upon his son for $1600, dated Sept. 11, 1820, directing the trustee to receive any kind of property in part payment, expressing a wish to give the same to Mrs. Colburn and her children, in trust. Colburn, in part satisfaction of this demand transferred to Gailliard, a negro slave named Rachel, at $300, which sum was credited on the note. At the same time, one Nye was indebted to Colburn by note, and it was proposed by the latter to assign it to Gailliard, on receiving credit upon his note. This was agreed to and Gailliard took from Nye a conveyance of certain lots to the elder Colburn, who subsequently conveyed them to Gailliard, as trustee for Mrs. Colburn and her children. In March of the same year, Colburn also sold to Gailliard his household and kitchen furniture, to the amount of $375, with trust monies, as the bill alledges; but the receipt exhibited, states the payment to be in receipt of collections for negro hire, as per account rendered.

In March, 1834, Coolidge purchased from one Ballard certain slaves, to wit: Susy, about 35 years old; Leonidas, about 12; Polly, about 10; Franky, about 6; Kelly, about 35; Richmond, about 11; and Leah, about 8. Coolidge was then in the receipt of the income of the trust estate, and never had rendered any account. Previous to the purchase, he oftentimes declared he wished these slaves for Mrs. Colburn and her children, and after the purchase for the sum of $2,750, and three horses, declared they were bought and paid for, for the benefit of her and her children, and the conveyance was to her in his name, as trustee for her and her children.

These slaves, by the direction of Coolidge, were delivered to Mrs. Colburn, and remained in her possession as the property of herself, and children, and were so acknowledged by Coolidge. Over them she exercised the same control as over her other property, most of them being immediately about her person, and taken and regarded as her and her children's property. The bill charges that these slaves were purchased with trust funds, or that if with means of Coolidge, it was intended to be in payment of monies used by him of the trust funds, and in either event, the complainants in equity are entitled to them.

With a full knowledge of these facts, one Jonathan Coolidge, as the administrator of the estate of the said William C. Coolidge, commenced an action of detinue for the slaves last named against Colburn, in the Circuit Court of Monroe county, and recovered the same at the October term, 1838. The execution issued on said judgment was levied on the slaves, and they were sold in satisfaction of the said recovery. The bill charges that this levy and sale was illegal and void, and prays that the same may be set aside, and the slaves restored, or that a decree may be made for the value of the same, and their services to be conveyed to the complainants in trust.

Subsequently to the last named transaction, Edward S. Broughton, sheriff of Monroe county, by virtue of his office, became administrator *de bonis non* of the estate of Wm. C. Coolidge, and obtained a judgment against Colburn, at the July term, 1839, for upwards of $10,000, execution upon which issued the 16th of July, 1839, under color of which the coroner forcibly took possession of the slaves and other personal property of the trust estate and evicted Mr. Gailliard the then acting trustee. The property was sold, and the several persons named as defendants, became the pretended purchasers, but they have never paid the purchase money, although possession was delivered under the sale.

Elizabeth English purchased the slaves Rachel, Peter and Ned. Leonard J. Moore purchased the slaves Sally and her two children, Jenny and Camilla. Joseph G. Lindsey, purchased Betsey and Sterling. John A. Gwynn, purchased Lettuce. Adam Carson, purchased Lucy. William F. An-

dress, purchased one of the horses, and George Foster the other, and Marshall Gill the barouche and harness.

The bill charges, that all the facts stated were known to the defendant, Broughton, who had been requested to settle the trust estate.

The bill prays that the several deeds of trust before named, may be set up, established, and the trusts carried into execution, an account taken of the trust estate that came to the hands of Coolidge, in his lifetime, and into that of the defendant since his death, and for general relief. Broughton, Colburn, and the persons named as purchasing at the sheriff's sale, are made parties defendant.

They all sever in their answers, the effect of which may be thus condensed.

Colburn admits all the facts charged in the bill, and sets out the deeds of trust, and various accounts, explanatory of the several transactions spoken of in the bill.

All the other defendants, except Lindsay, pray that their answers may be taken as a demurrer to the bill, and set out as cause of demurrer—

1. That the bill is filed by a *prochien amy*, and not by a trustee.

2. That the bill shows there was a trustee at the time of its filing, and he is not made a party.

3. That one of the complainants is a *feme sole*, and her husband living, and not joined.

4. That the children of Mrs. Colburn have no interest in the subject matter of the bill, or in some of its parts.

5. That one of the objects of the bill is, an account against Broughton as administrator of Coolidge, in which the children have no interest.

6. That the bill is against several, who have no common interest, and not chargeable jointly.

7. That the matters of the bill are cognizable at law, and no facts are charged which invests a court of equity with jurisdiction.

8. The bill seeks to divest the defendants of rights which are several and distinct.

9. Misjoinder of complainants, no proper complainant, and misjoinder of defendants.

In addition to these causes, Broughton sets out—

10. That Colburn is made a party, and no relief prayed or sought against him.

11. The bill seeks to establish deeds, notes, &c. between Jas. T. Colburn and J. B. Colburn, Gailliard and the complainants, and does not charge the defendants with notice, &c.

12. That the bill seeks relief with respect to the Pollard slaves, when at the same time it declares that the suit was effectual to recover them, the complainants being parties, or privies. Broughton admits the execution, probate and recording of the deeds, as set out in the bill, but insists on strict proof, as he is sued in a representative character. He, as well as all the defendants, except Colburn, insist that the deeds and transactions sought to be set up, are fraudulent and void, as contrived to delay, hinder and defraud creditors of Colburn, and because the trust property was in his possession when the deeds were executed, and has so remained until the sale. Broughton and Mrs. English insist they are creditors, and the other creditors, except Colburn, admit they purchased the slaves at the coroner's sale for fair prices, actually paid by them.

Lindsay demurs generally to the bill, and Carson disclaims any interest, alledging that he purchased for Mrs. English, to whom his bid was transferred, and who paid for the slaves.

Broughton also pleads in his answer, the statutes of limitations of three and six years, the statute of non-claim, and the insolvency of Coolidge's estate, duly represented as such, in bar, and all the defendants deny the charges of fraud, collusion and combination.

The pleas in Broughton's answer were stricken out, or rather the answer taken off the file as to them, and an amended answer filed. He also suggested the expiration of his office to abate the suit as to him, but the Chancellor, considered him to continue as a proper party.

Several witnesses were examined preparatory to the hearing of the cause, and the substance of their testimony may be thus stated. Adam Carson knew Coolidge for seven or eight years; he also knows the slaves sold by Bullard to Coolidge (which are the same as set out in the bill,) they, at the time

of his examination, were in the possession of Robt. H. Gill. In a conversation with Coolidge, he was told by him, the slaves had been in the family a long time, and he had purchased them for Mrs. Colburn and her children. This was 12 or 18 months after the purchase. This witness was appointed one of the appraisers of Coolidge's estate, and objected to appraising these slaves, as being a part of it, because of what Coolidge had said as above, and they were not appraised. This witness was present at the coroner's sale, and states that Mrs. Colburn then forbid it, and afterwards demanded the property from each purchaser.

Thomas Gailliard states, that Smith was the trustee from Coolidge's death until 1838, when he himself was appointed to act, until the then next term of the Circuit Court. This witness received $800 from Mrs. Colburn, and from all sources $983, as trust funds. He also received the three deeds exhibited to the bill. Of this sum of money he paid $250 for a barouche and horses. The only slaves which came to the actual possession of this witness were, Peter, Sally and Betsey, but all of the others mentioned in the trust deeds but Sukey, were shown to him by Mrs. Colburn, at her residence. He never visited the plantation but once, but leased a portion of the cleared land one year. All the slaves might have been profitably employed on the lands, and probably could have made 40 bales of cotton in 1839, and sufficient corn. One of the slaves, Betsey, was taken from the person to whom the witness, as trustee, had hired her. He declined to interfere with the proceedings by the coroner, for the reason that his appointment as trustee had expired.

This witness proves the transaction between himself and James B. Colburn, with regard to the transfer of property to him, as trustee, in satisfaction of the note due to the elder Colburn, substantially as stated by the bill. -

Thomas Murphy states that Coolidge resided in the family of Colburn until his death, as one of the family. Witness was employed by Colburn to oversee a plantation then in Colburn's possession, but which formerly belonged to J. P. Bradford—he was employed in 1835, by both Colburn and Coolidge, and in 1836 by Colburn, and paid by him. The usual crop was from 35 to 40 bales of cotton, weighing 420

punds, and worth about $40 per bale; the crop was some-times shipped by Colburn, and sometimes by Coolidge. A sufficiency of corn and fodder, and part of the meat was rais-ed, but sometimes purchased. Sometimes Colburn, and then Coolidge, went to Mobile and purchased articles necessary for the plantation. Witness thought the proceeds of the planta-tion sufficient to support plantation and family. While liv-ing on the plantation Mrs. and Mr. Colburn and their family went to the north, and a daughter who was at school there, returned with them. The year that Coolidge died, the wit-ness was employed by him and Colburn jointly. Coolidge rented Fryer's plantation, and put on that the Bullard slaves with several others. Colburn put on several other slaves, being the same as those contained in the trust deeds. At first the slaves were worked separately, but afterwards, at the suggestion of Colburn and Coolidge, the plantations and slaves were worked jointly, and the crops were divided dur-ing the time witness was on the plantation. He was em-ployed by Coolidge and Colburn jointly.

J. F. Ballard states, that he, in 1834, sold the slaves men-tioned in that connection in the bill, to Coolidge, that Coo-lidge told him before the purchase, that he wished to pur-chase them for Mrs. Colburn and her children, to whom he wanted to give what he had, as they were the only persons he cared for. Witness sold the slaves under this impression and belief, and took a less sum than he could have got. He had frequent conversations with Coolidge, both before and af-ter the sale, which left the impression before stated. His impression also was, that the bill of sale was executed to Mrs. Colburn, but he never read it, and the impression was made by the conversations before referred to. Coolidge said to Mrs. Colburn, the slaves being present, "here are the negroes, I have bought them for you," and advised her to take one of them for a house servant, and another as a little maid for her daughter, Susan.

A. B. Puryear proves that he exchanged Peter for Sukey, Colburn and Coolidge both being present, and seeming to act.

John Lee proves, that for two years he managed a planta-tion, near Claiborne; was employed by Colburn, but paid by

Coolidge. He understood the slaves, or the most of them, were held in trust by Coolidge, and that they were, at some future time, or at his death, to go to Colburn's children. The first year, only corn was made, but the second, 28 bales of cotton, weighing 450 each, worth 14 or 15 cents per pound, were shipped by direction of Coolidge, who gave him instructions generally, about the management of the plantation. This was in 1832 and 1833. The necessaries for the plantation were furnished generally, by Coolidge. The plantation did not make sufficient to support the family, which the witness states was extravagant in some respects.

Samuel Bradford states, that Coolidge told him he was Mrs. Colburn's trustee, and transacted her business. Knows the slaves Phœbe and Sally, conveyed to Coolidge by J. G. Bradford; they were put in Coolidge's possession by J. G. Bradford, under the trust deed. Coolidge lived with Colburn, and took possession immediately after the .deed was made, and kept possession until his death. Coolidge cultivated the land with those negroes until his death, and made good crops. Knows the slaves sold by Ballard to Coolidge, they were family slaves, and on that account sold cheaper to Coolidge. Coolidge told the witness, that he bought them for Mrs. Colburn, so as to keep them in the family; told the witness this both before and after the purchase; he often told him his property was intended for Mrs. Colburn and her children. Colburn did not have the possession of the slaves spoken of, before the deeds were made; having married his wife contrary to the wishes of her father, the deed was made in favor of his wife and children. Coolidge and Colburn lived together. He does not know whether the plantation made enough to support the family or otherwise. Coolidge sent to Mobile for meat. He owned four or five valuable slaves.

There was other testimony identifying the slaves, proving the forbidding of the sale and the demand of the purchasers by Mrs. Colburn.

The Chancellor considered all the deeds as in effect made by Colburn, and as fraudulent and void, by reason of their hindering, delaying and defrauding creditors. The bill was therefore dismissed as to all the parties, without entering on

the questions raised by the demurrers, which he considered as open if the case should be reviewed. This decree is now assigned as error.

F. S. BLOUNT and E. W. PECK, for the plaintiff in error.

A. F. HOPKINS, contra.

GOLDTHWAITE, J.—1. The first questions which demand our attention are those which arise out of the demurrers to the bill, inasmuch as, if that is defective it becomes a matter of minor importance to consider whether the complainants are entitled to relief in some other mode.

The objection is made to the bill, that it is multifarious, in combining together several distinct matters, which have no necessary connection with each other, and that parties are joined, both as plaintiffs and defendants, who have no interest in some of the objects of the bill. The rule, as recognized in this court is, that the bill must set forth several distinct matters, perfectly unconnected, (Chapman v. Chinn, 5 Ala. Rep. 397,) or where the case of each defendant is entirely distinct and separate in its subject matter; from that of the other defendants. [Kennedy v. Kennedy, 2 Ala. Rep. 571.] This case comes precisely within these rules in one aspect in which it may be viewed. So far as the defendant, Broughton, is sought to be made liable as the administrator of Coolidge, for trust funds received and not accounted for by his intestate, and also so far as he is sought to be charged as administrator *de bonis non* for the Ballard slaves, recovered and sold under the execution of the previous administrator, there seems to be no connection whatever with the other defendants, who are sought to be made liable for the specific property purchased by them at the coroner's sale. The liability of Coolidge's estate to account for his action as trustee, is a matter with which those claiming a title to the slaves adversely to that trust have nothing to do.

2. In like manner, if Broughton was the sole defendant to this bill, it would be obnoxious to the exception that the complainants were improperly joined. One object of the bill

is, to compel him to account for the profits of the trust estate received and converted by him; and these, according to the showing of the bill itself, were belonging to Mrs. Colburn alone, without the slightest interest whatever being vested in her children, her co-complainants. Where parties are joined as complainants who have no interest in the matter in controversy, the bill is bad on demurrer. [Whittaker v. De Graffenreid, 6 Ala. Rep. 303.]

3. But there is a more serious objection yet to the bill, so far as the individual purchasers at the coroner's sale are connected with it. We readily concede that a purchaser of trust property from, or under the trustee, with notice of the trust, is himself chargeable in equity as a trustee. But here there is nothing to connect these individuals with the trustee, and they claim adversely to him; it is not his title which they held, or one derived through him, but their claim, if good at all, is so entirely independent of the trust deed. To insist that equity can take jurisdiction of a title thus disputed, would invest it with cognizance of all disputes concerning property upon which a trust had ever been created.

It is entirely evident, that property held in trust is as much the subject of inquiry as that which is not, but it is too common a mistake to suppose the creation of a trust carries the property itself into equity. The law usually provides a different and more appropriate forum to determine conflicting and adverse titles to the property. We fully recognize the rule, that a purchaser of trust property from, or under the trustee, with notice of the trust, is himself chargeable in equity as a trustee. [Bank of Alabama v. Williamson, 7 Ala. Rep. 906.] But according to the allegations of the bill, Broughton never had possession of the property sold, as the administrator of Coolidge, and was not therefore affected by the obligations which his intestate had assumed with relation to it. He obtains a judgment against Colburn, and directs a levy upon property which that person is supposed to own. In doing this, we apprehend he stands as any other plaintiff who wrongfully directs a levy, and is responsible to the injured party in trespass or trover. The title sold under his execution, was not the title of Coolidge, the trustee, but that of a third person, which, if defective, invests the pur-

chaser with one that is of the same nature. Whatever may be the merits of this title, the purchaser it is evident, does not derive it from the trustee, either mediately or immediately, and in no sense can be said to be in collusion with, or holding under him. In point of fact, the whole case, as to these purchasers, makes it apparent they claim adversely to the trust estate, and in spite of it. It is then, as to all the defendants except the husband, an attempt to litigate the title to personal property in a court of equity. We know of no condition of facts under which a court of this description can determine such a question. Doubtless a *cestui que trust* may go into equity to prevent a sale of the trust estate, until the right can be ascertained elsewhere. To this effect is Cozzens v. Calhoun, 3 Ala. Rep. 498, where an injunction was sustained by a *feme covert* to restrain her husband's creditor from selling her separate estate. Here, however, the property has already been converted, and the suit is, to regain, or have satisfaction for it, from persons who neither claim under, or are in privity with the trustee.

4. The mere circumstance that a trust is created upon certain property, does not invest a court of Chancery with jurisdiction to determine the disputes which may arise with respect to the *title* to that property. If it was so every *cestui que trust* might sue in equity, instead of his trustee at law for injuries done to it. Lord Redesdale said, a *cestui que trust* is always barred by length of time operating against the trustee. If the latter does not enter, and the *cestui que trust* does not compel him to enter as to the person claiming paramount, the *cestui que trust* is barred. [Hovenden v. Lord Annesly, 2 Sch. & Lef. 629.] And Lord Hardwick had long before held, the rule applied only as between *cestui que trust* and trustee, and not between them on one side and a stranger on the other. [Lewellen v. Mackworth, 2 Equity Ca. Ab. 579.] In Finch's case, 4 Inst. 85, so long ago as the reign of Elizabeth, it was resolved by all the judges, that a disseisor was subject to no trust, nor any *subpœna* was maintainable against him : not only because he was in the *post*, but because the right of inheritance or freehold was determinable at the common law, and not in Chancery; neither had the *cestui que trust* any remedy in that case. To the same

effect is Mr. Sugden, in his edition of Gilbert on Uses, 429, note G., who there says, that persons claiming the legal estate by an actual disseisin, without collusion with the trustee, will not be bound by the trust. Therefore, if J oust A, who is a trustee for B, and a claim is not made in due time, A will be barred, and his *cestui que trust* with him, although J had notice of the trust. These citations seem conclusive to show, that the creation of a trust has no effect to draw the contests with respect to the title of the property to a court of Chancery, and that it is only persons who are trustees, or who claim under such, or by collusion with them, who are accountable to the *cestui que trust*.

5. But it is insisted by the bill, that after the death of Coolidge, the trust ceased, or rather, that at the time of filing the bill, there was no trustee capable to sue, and therefore the jurisdiction is maintainable. Doubtless such a condition of things might furnish sufficient equity for a bill to prevent a sale or removal of the property beyond the jurisdiction of the court, until a trustee could be appointed, but it furnishes no ground for investigating the legal title with a *bona fide* adverse claimant. And, indeed, the necessity to even file a bill of this nature, is greatly lessened by our statutes authorizing the summary appointment of trustees. [See Clay's Dig. 581.] At common law, trusts partook of the nature of the trust property, and if that was real, descended to the heir, and was capable of being devised; if personal, the trust went to the administrator. This necessarily produced great difficulties even in England, where the bulk of personal property is not so locomotive as with us, and has caused the enactment of statutes similar in some respects to our own on the same subject. [See Lewin on Trusts, 473, 242.] It appears from the bill, that Mrs. Colburn, immediately after the death of Coolidge, in 1838, procured the appointment of a trustee in his stead, and the consequence of this was to prevent any right in this respect from passing to his personal representative. Whatever was the condition of the trust estate at that time, the effect of the appointment was to make the representatives of Coolidge entire strangers to it except so far as that or its proceeds had come to their hands.

6. The trusteeship being thus severed from the adminis-

tration, could never be again united with it ; and therefore, conceding the appointment of Gailliard to be temporary only, this circumstance creates no new and distinct ground upon which the jurisdiction of equity can attach, except for the limited purposes already shown.

The conclusions already arrived at, show the bill was properly dismissed, without reference to the intrinsic merits of the complainant's title to relief; beyond this too, they show that the relief for the conversion of the slaves, as well as for their recovery, must be sought in a court of law.

7. But as the equitable right of Mrs. Colburn to have an account from the estate of Coolidge, of the funds received by him as trustee, may induce another suit, we deem it proper to express an opinion, that whatever may be the merits of these conveyances, as between the creditors of Colburn, and the *cestui que trusts*, his representatives are estopped from setting up another title than the one under which the intestate held. Notwithstanding his liability to account, it may well deserve consideration, what assets could remain in his hands, when it is made to appear that the whole proceeds of the trust property worked on the plantation was insufficient to support the family.

With respect to the legal title under the deeds, and to the barouche and horses, it is improper to express our judgment, as the title has not yet received the consideration of the proper court. If further proceedings are considered as desirable it is not irrelevant to remark, that a distinction may be found to exist between the title conveyed by Bradford and that derived from Colburn, and a similar remark may be made with relation to the barouche and horses.

Decree affirmed.