## HUNLEY ET AL. V. HUNLEY.

1. One person being the executrix of R. H. and the administratrix of Richard H. his son, the latter estate being indebted to the former, a bill is not multifarious, which makes her a party, and unites a claim against both estates, although a claim is also asserted against her as due from Richard H. to R. H. She was a necessary party to protect the interest of the former.

2. The objection cannot be taken for the first time at the hearing, that one was improperly made a defendant, he having answered fully, tendering issues both of law and fact. No decree having been rendered against him, his having been a party, cannot affect the decree made against another defendant.

3. A court of chancery has jurisdiction to entertain a bill for a discovery of assets, which an administratrix has not returned in her inventory.

4. Where a father went to live with his only son, who afterwards worked their slaves on the plantation of the son in consideration of which the son supported the father, after the death of the father, the son should be charged with the reasonable hire of the slaves, if he kept and employed them.

5. The declarations of a grandfather, that he had given certain slaves to the

children of his son, will not constitute a valid gift, in the absence of proof of an actual delivery, the slaves being found in his possession, at his death. The fact that the slaves were under the control of the father of the children will not vary the case, there being no proof that they were delivered to him for the purpose of consummating the gift.

6. Admissions, or declarations, will not operate an estoppel against the party making them, unless he derives some advantage, or gains some object thereby, or the opposite party is induced to act upon it, or sustains some injury in consequence of trusting to its truth.

Error to the 12th Chancery District. The cause was tried before the Hon. Chancellor Lesesne.

The facts will appear in the opinion.

GEO. GAYLE, for the plaintiff in error made the following points :

I. The bill should have been dismissed as to Richard Hunley ; his answer showing he had no interest, and he being improperly joined. Toulmin v. Hamilton, 7 Ala. 362 ; Cherry et al. v. Belcher, 5 S. & P. 133.

II. 1. Under the demurrer the bill should have been dismissed for want of jurisdiction ; the orphans' court having previously taken jurisdiction for a final settlement, &c. See Apperson v. Cottrell, 3 Porter, 51 ; Eaton v. Patterson et al. 2 S. & P. 9 ; Cherry & Bell v. Belcher, 5 Ib. 133 ; Dobbs v. Cockerham, 2 Porter, 328. 2. The case in 9 Ala. 391, seems to conflict with these cases, but there the administrator claimed the property under secret gifts. 3. The bill don't charge the orphans court inadequate to the relief asked ; and does not show that Caroline M. Hunley, as administratrix, has ever refused to account, or is in any default.

III. The decree is erroneous in holding Caroline, as executrix of Ransom Hunley, her husband, to an account under the bill filed for any portion of the crop of 1843. 1. The bill is multifarious, and the chancellor splits and divides the multifariousness ; overrules and sustains the demurrer for that cause, and leaves the question of multifariousness as though it had not been decided. I have only to show then, that the bill was multifarious to reverse the decree upon the decision on the demurrer. 2. The bill is multifarious—1.

Because Ransom and Richard, farming in co-partnership in the year 1843, it seeks to settle that co-partnership with the representative of the surviving partner, and to compel the representative of another person to account for a portion of his private property, Caroline being the administratrix of one, and the executrix of the other. 2. Because there should have been two bills filed; one to compel Caroline, as executrix of Ransom, the surviving partner in farming, to settle the partnership, and pay complainant her interest in Richard's estate, or interest in the partnership, she being his widow; the other against Caroline, if chancery had jurisdiction, as administratrix of Richard, to discover assets, and settle, &c. The bill is clearly multifarious. See Colburn et al. v. Broughton et al. 9 Ala. 351.

IV. The chancellor erred in decreeing that the eight negroes were not a gift to the children of Ransom G. Hunley. To constitute a good parol gift, there must be a delivery, or a change of dominion; and both of these are unnecessary under some circumstances, as where a father gives to an infant child. See Sewell v. Glidden, 1 Ala. 53; Sims v. Sims, 8 Porter, 440; same, 2 Ala. 117, Goldthwaite's opinion; Caldwell v. Wilson, 2 Spears, 76; McLuny v. Lockhart, 1 Bailey, 117; Blake v. Jones, 1 Bailey's Eq. 141; same, 2 Hill's Ch. 629; Sanderson v. Marks, 2 H. & Gill, 252; 2 U. S. Dig. 468, § 53.

I maintain that the facts show, that Ransom G. Hunley, the father of the children, had possession of all the property of Richard, his father, from 1838, up to Richard's death, in 1843, and supported and controlled them, and supported said Richard and his family; during which period Richard said he had given the negroes to the children.

JUDGE and BOLING, for defendant in error.

1. As to the jurisdiction of the court, see Blakey, adm'r, et al. v. The Heirs of Blakey, 9 Ala. 391; Leavens v. Butler, 8 Porter, 399.

2. It is satisfactorily proved, that Richard Hunley remained in possession of the slaves until his death, exercising ownership over them. There appears, it is true, to have been an understanding in the families, that the slaves belonged to

the children of R. G. Hunley, who claim them, and declarations of Richard Hunley are proved, which might lead to such a conclusion; but these are not sufficient to divest his title. Blakey, adm'r, &c., *supra*.

3. Nothing is proved which in law would amount to a gift. Blakey, &c., *supra;* Sims v. Sims's adm'r, 2 Ala. 117, and authorities there cited. The paper upon which the names of the children of R. G. H. and the slaves were written, is not produced, or proved, and justify the inference that if produced, it would amount to nothing. If this paper was a deed, (but the proof shows it was not,) and exists, and is not produced, this fact weakens the force, and throws discredit upon the inferior testimony adduced of the same fact, if indeed it does not render it entirely valueless. Blakey, adm'r, &c., *supra*.

4. But independent of this consideration, there is no proof of a gift of the slaves. The declarations of Richard Hunley in relation to the gift, were contradictory at different times; nor does it appear that he ever parted with the possession, or the right to exercise control, or dominion over them, during his life, and there could not therefore be a valid gift of the slaves at common law. Blakey, adm'r, &c., *supra*.

5. It is evident that all that Richard and Lucy Hunley said about a gift of the slaves, was founded upon what took place when the names of the slaves and the children were written down. And all, or most that the witnesses prove, whose testimony is relied on to prove a gift, are such declarations of Richard and Lucy Hunley. Then if the writing of the names down, was not a gift, no gift is proved.

CHILTON, J.—The bill in this cause was filed by the defendant in error, on the 8th May, 1846, and charges, that in 1843, Richard Hunley, the late husband of complainant, departed this life intestate, leaving complainant his widow, and Ransom G. Hunley his son, and only heir at law. That after the decease of his father, but in the same year, Ransom G. Hunley departed this life, having made and published his last will and testament in the county of Lowndes, by which he appointed Caroline M. Hunley executrix, said Caroline being his widow. That said will has been duly recorded,

and said Caroline has taken upon herself the execution thereof. That said Caroline was also appointed by the orphans' court of Lowndes, the administratrix of said Richard Hunley, deceased, and qualified as such. That the said Ransom, deceased, left five children, viz: Richard, Mary, Peter, Ann and Ransom, all of whom are infants, residing with their said mother, Caroline, and the two last are under the age of fourteen years. That no guardians have been appointed for either of said children, who represent their deceased father, and share with complainant in the estate of Richard Hunley, deceased. That said Richard died seized and possessed of a large estate, both real and personal, and if at all indebted, owed a very small amount. That Caroline, in January, 1844, returned an inventory of said estate to said orphans' court of Lowndes county, which is made an exhibit to the bill, but that in the inventory no mention is made of eight slaves, named in the bill, and charged to belong to said estate, and which did come, or should have come into the possession of said Caroline, as administratrix. That she has never accounted for said slaves in any way whatever.

The bill further charges, that in the year 1837, Richard removed from the State of South Carolina to Lowndes county, and settled on the premises of Ransom, his son, and they there commenced working their hands together in the business of planting, and continued there until the year 1843, when both of them died. That the crop of 1843, made by the labor of their hands, had not then been sold, nor the profits accruing upon it that year, divided; but was afterwards sold by said Caroline, and she has failed to account for the same, as will appear by her inventory, exhibited to the orphans' court. Complainant avers her ignorance of the quantity of produce raised on the farm in 1843, and prays a discovery of the proceeds, which have come into the hands of said administratrix.

The bill also alledges, that a partial distribution has been made of the estate of said Richard, and that it will be ready for final settlement as soon as Caroline returns the eight slaves, and the proceeds of the crop, as assets. That the debts due to and from the estate have been settled.

The complainant prays subpœna against the said widow

and children of Ransom Hunley, and seeks a discovery and an account of the eight slaves and crop of 1843, and that a settlement be had in the chancery court of the estate of said Richard Hunley, and final distribution made of the effects; also, that proceedings be enjoined in the orphans' court.

The answers deny that the eight slaves belong to the estate of the said Richard, but on the contrary, aver that they were given by him in February, 1838, to his four grand children, viz: Mary, Peter, Ann and Ransom, and were then delivered by him to Ransom G. Hunley for them, he being their father and natural guardian, and remained in his possession up to the time of his death. That said slaves have always, since the gift, been known and regarded as property belonging to said children.

As respects the profits of the farm for the year 1843, the answers aver that the parties lived together and cultivated the farm, under an agreement that the said Ransom should take charge of the slaves and stock, and carry on the business of farming on his premises, and that he should support and provide comfortably for the said Richard and his family—pay all expenses of carrying on the business, and provide said Richard, from time to time, such small sums of money as he might need or require, and the said Ransom G. Hunley was to have and receive the whole proceeds, above the expenses and outlays aforesaid, for his own proper use, and free from all account to any one. That the two families, stock, &c. belonging to both estates of Richard and Ransom, were supported on the produce of the crop of 1843, until crop time in the ensuing year, and nearly consumed the corn, fodder, &c. That one hundred and eight bales of cotton were raised, one hundred and three of which the administratrix has sold, as appears by returns of sales made by commission merchants, and attached to her answer. That in the making of the crop of 1843, Ransom worked about thirty hands, and Richard about twelve; and the said Caroline insists that if she is bound to account for the proceeds of the crop of 1843, she should only account for the proceeds of six hands, after allowing a deduction for their proportion of expenses incurred in carrying on the business, and a reasonable rent for the land. The answer further insists, that the amounts paid out

for Richard, since his death, by Caroline, coupled with the expenses incurred in the administration, will amount to as much as the distributive share of the complainant in the crop: avers also, a regular division was made of the estate of said Richard Hunley, early in the year 1844, and that the complainant received her share of the property. That nothing belonging to the estate of said Richard Hunley is now in her hands for distribution. The chancellor decreed an account to be taken of the crop of 1843, and that the eight slaves alledged to have been given to the children of Ransom, were the property of the estate of Richard, deceased. Several questions of law are raised upon the frame of the bill by demurrer, which we will consider before we come to the proof in the cause.

1. It is objected, that the bill is multifarious, and the chancellor was of this opinion, but permitted the complainant to elect to proceed against the defendant as administratrix of the estate of Richard Hunley, for the eight negroes, and the share of the crop, which she alledged belonged to said estate.

The defendant, Caroline, is the executrix of the estate of Ransom G., and the administratrix of Richard Hunley, deceased. The assets and funds of the estate of Ransom being in her hands, if that estate was indebted to the estate of Richard, the distributees of the latter estate, might well regard the debt as paid to her, and proceed against her as the administratrix of the intestate, Richard, for the amount due. She is presumed to retain out of the estate of her testator the amount of the debt, and this presumption obtains, whether the demand be liquidated or otherwise. Draughan v. French's adm'r, 4 Porter, 352; McLane v. Spence, adm'r, &c. 6 Ala. Rep. 894. Although the complainant could have obtained relief for any portion of the crop due from Ransom to Richard Hunley, without making the defendant a party *as executrix* of the former, still this does not render the bill multifarious. As the representative of Ransom, who was the only heir of Richard, it was proper that she should be brought before the court, that she might protect the interest of the estate.

The case does not come within the principle ruled in Col-

burn v. Broughton, 9 Ala. Rep. 351, where matters wholly distinct were united in the bill against the same defendants, and other persons were also made defendants, who had separate and distinct interests.  It is more nearly analagous to the case of McCartney v. Calhoun et al. 11 Ala. Rep. 110, in which it was held that where one was administrator of two estates, a claim might be asserted in the same bill against both.   See also Donaldson's ex'rs v. Pope & Posey, 13 Ala. Rep. 752.

If, however, the bill was multifarious, the court very properly permitted the complainant to elect, for which cause of complaint she would proceed.   Marriat & Hardesty v. Givens, 8 Ala. Rep. 710.

2. There is no error in making Richard R. Hunley a party defendant to the bill.   He claims a distributive share of the estate of his grandfather, Richard, and although he disclaims an interest in the eight slaves sought by the bill to be made assets of said estate, and insists upon the validity of the gift of them to his brothers and sisters, still, if the gift is set aside, the property would be distributed, and he would come in for his share.   Besides, he does not merely file his disclaimer of all interest, and pray a discharge ; but answers fully, tendering many issues of fact, as well as of law, and thus voluntarily undertakes to share the burthen of the litigation.   No decree has been rendered against him, and his being a party cannot affect the propriety of the decree rendered against the administratrix.   It is also well settled, that such objections come too late at the hearing.   Erwin v. Ferguson, 5 Ala. Rep. 158 ; Story's Eq. Pl. 417, § 544 ; Newhouse et al. v. Miles et al. 9 Ala. Rep. 460 ; see also Heirs of Holman v. Bank of Norfolk, 12 Ala. Rep. 369, upon the subject of disclaimer.

3. Neither can the objection for want of jurisdiction be allowed to prevail.   The eight slaves, and the portion of the crop sought to be recovered, had not been returned by the administratrix in her inventory.   If this property really belonged to the estate of Richard Hunley, a discovery, and an account of the hire of the slaves and the proceeds of the crop, were necessary to a proper adjustment of the matter, and the limited jurisdiction of the orphans' court did not furnish ade-

quate relief. It was therefore permissible for the complainant to resort to the court of equity for this purpose, and that court, having obtained jurisdiction of the cause for one purpose, will proceed to dispose of the whole case. The cases of Leavens v. Butler, 8 Porter, 399, and Blakey's adm'r v. the heirs of Blakey, 9 Ala. Rep. 391, fully sustain the jurisdiction. See also Dement et al. v. Adm'rs of Boggess, 13 Ala. Rep. 140. The cases of Cherry & Bell v. Belcher, 5 S. & P. 9, and Dobbs v. Distributees of Cockerham, 2 Porter, 328, cited by the counsel for the plaintiff in error, do not militate against the view we have taken. In the case last cited, the court held that the truth of an inventory might be contested in the orphans' court, and a jury summoned to try the fact, but say further, "the most ordinary course appears to be, to proceed by suit on the administration bond, or by bill in chancery." 2 Por. 338.

4. Many witnesses have been examined upon the subject of the alledged gift of the slaves, and the interest which is claimed by complainant in the crop of 1843. We will briefly state the evidence, that it may be seen on which side it preponderates.

The first witness examined (Woodall) proves that in 1843 Richard G. Hunley told him, he and Ransom worked their hands together, but that all the proceeds were to go to Ransom, as all that he, the said Richard wanted, was enough to live on. That Ransom was his only son, and that after his (Richard's) death, all his property should go to Ransom. The same conversation is deposed to by the wife of witness, Mrs. Harriet Woodall.

Joshua Carroll was the overseer for Ransom Hunley during the years 1842–3, and in these years, heard Richard H. frequently say the slaves in controversy belonged to the the children of Ransom. That he had given to Richard R. Hunley, the eldest son of Ransom, two slaves in South Carolina by deed, which he had recorded, and that he had given since then two negroes to each of Ransom's other children. This witness further proves that the complainant below, Lucy Hunley, both before and since the death of her husband, pointed out the slaves in controversy as belonging to Ransom's children by gift from her husband, naming the slaves

which belonged to each.    That Richard Hunley lived on the
farm occupied and controlled by Ransom, and which belong-
ed to the latter, who superintended the farming operations,
and paid all the expenses incident thereto.    That Richard
told the witness in the years '42–3, that when he came to
Alabama, he had given up all to said Ransom, and all he
wanted was a comfortable support.    That Ransom supported
him.    That Richard frequently designated the slaves which
he had given to the children, being the eight slaves now in
controversy, and said that he had not then, but intended to
have the deed recorded, as he had previously had the deed
of gift to the eldest son recorded in South Carolina.    That
the slaves were most generally about the house of Ransom
G. Hunley, and fed in his yard, &c.    Richard had five or six
slaves, which were used as house servants—the remainder of
the slaves on the place were put under this witness, as over-
seer in the name of Ransom.    That after the death of Ran-
som and Richard, the witness continued in the employment
of their respective widows, who had a division of the slaves ;
said Lucy, the complainant, putting under his control eight
or ten hands, and Caroline, the defendant, about forty-eight.

The witness Lavenberg, proves that the children claimed
their eight slaves in the presence of Richard and the com-
plainant.    That the complainant, in the presence of her hus-
band, named the negroes which she and her husband had
given to Ransom's children, being the slaves in controversy
—two slaves to each of the children.

Wm. Miller overseed for Ransom in the years '39 and '40,
and proves that Ransom controlled the hands and farm, and
furnished provision for the hands, and incurred the expense
of carrying on the farming operations; Richard residing on
the place owned by Ransom, and having his dwelling house
a few hundred yards from him.    That the children of Ran-
som frequently claimed the slaves in controversy in the pre-
sence of Richard, between the years '38 and '43, and he
made no objection to their claim.

The witness McDonald, proves that he has seen said slaves
about the house of Ransom G. Hunley, and it was generally
understood in both families, that they belonged to the chil-
dren of Ransom, but thinks they were too young to be sepa-

rated from their mother, who belonged to Richard, and too small to work, and that they were more in the possession of Richard than of Ransom. This witness also heard Lucy Hunley, both before and since the death of her husband, speak of the slaves in controversy as having been given to the four youngest children of Ransom.

J. B. Stephens heard complainant say, a day or two before the death of Ransom G. Hunley, that her late husband, Richard, had given the slaves to the children of Ransom, and that she had nothing to do with them. She did not, however, specify the slaves. That this declaration was made by her upon being informed that she had been sent for by Ransom "to know something about the little negroes which his father (Richard) had given to his children."

Mrs. Wilson proves that Richard Hunley pointed out to her eight young negroes, then standing in his yard, saying he had given them to his four grand-children, Mary, Peter, Ann and Ransom, the children of Ransom R. Hunley—two apiece; but the witness does not know the slaves in controversy were those pointed out, except the girl Hester. That Richard Hunley always spoke of these negroes as belonging to said children.

Angus McKaskal overseed for Ransom in '41–2, and proves that the slaves of Richard and Ransom worked together on the place of the latter, and under his control. That Richard had some forty or fifty acres of land belonging to himself, but had nothing to do with the management or superintendence of the hands and farm. That the provisions for the slaves were furnished by Ransom.

Mrs. Jones was present at Ransom's house during his last illness, when he sent for the complainant; upon her arrival, she asked the witness why she was sent for, and was told that Ransom desired to know something about the children's negroes—whether she would object to the children having them. That the complainant, being very much agitated, replied, "Oh no! I wonder if Ransom does think I would wrong the children."

The witness McRee, boarded with Ransom from 1836 to the spring of 1840, with a slight intermission, and states that Richard repeatedly told him he had given the eight slaves to

the four children of Ransom. That he designated the slaves given to each, but the witness does not remember their names. He further states that the children claimed their respective slaves so given, and that it was well understood in both families the slaves belonged to them, and which of the slaves belonged to each. That Richard lived about a half mile from Ransom, and the houses occupied by the slaves of each were located between their dwellings, but the slaves were fed by, and were under the control of Ransom, except those immediately about the house of Richard, used as house servants, cook, &c.

Arabella McDonald, who was examined on the part of the complainant, states, that she was well acquainted with the parties. Has known the slaves in controversy from their birth, and that they were always in the possession of Richard, up to the time of his death, and were afterwards taken out of the possession of Lucy Hunley, by a servant woman, and placed in the possession of plaintiff in error. She further proves, that upon one occasion, when at the house of Ransom Hunley, he and his said father came into the room, the latter having a piece of paper laying upon a book in his hand, remarked to Lucy, his wife, that Ransom wished him to give each of his other children two negroes, to make them equal with his son Richard, to whom he had already given two, and requested her to name the little negroes, so that he might make the selection, and as their names were called, he wrote them down with a pen or pencil. Immediately thereafter, Ransom and his father both walked out; the witness heard Ransom say, "that would not do;" adding that he wanted him "to fix it," or "attend to it," the next time he went to Hayneville, and they went to the house of Richard, where the little negroes were. This witness deposes to after declarations of Richard, showing that he considered the gift as not perfect, for want of delivery, &c.

Mrs. Morrison proves, by the declarations of the plaintiff in error, how he obtained possession of the slaves, by sending her daughter and a negro woman, and bringing them to her residence, and then locking them up. This was in 1846.

The witness, *Gingles*, deposes to conversations had with

Richard shortly before his death, in which he stated that he had given, or intended to give his grand children two negroes each, but that he had changed his mind; that he had not made a title to them, &c.

We have thus, after a careful examination, extracted from the mass of depositions taken in the cause, the substance of the proof, and our minds cannot resist the conclusion, that Ransom, being the only son of Richard, took charge of the property of the latter, under an agreement to support him, and to provide for his family. No special agreement to this effect is proved, but the circumstances in evidence, coupled with the repeated declarations of the father, that all he wished, or expected, was a comfortable support, and that he intended his property for his son upon his death; and taken in connection with the further fact, that provisions were furnished the father, and monies paid for him, as is shown by the depositions of some of the witnesses, without any accounting, or charges being made, all very satisfactorily show, that the use of the slaves was considered as an equivalent for the maintenance of Richard and his family. It is very clear, from all the proof, that Ransom was to pay no specified price for the hands, nor was Richard to receive any specific compensation in the division of the crops. Their hands had worked in common for many years, and the comfortable support of the old gentleman and his family was all that he received, and was, according to his oft repeated declarations, all that he desired, or expected. The proof presents the case of an aged parent, who, with property sufficient for his support, yet desirous of freeing his mind from the cares and anxieties of life, sought an asylum in the family of his only son; delivering over his property to his control, trusting it may be to the promise of his son, or to his sense of filial duty and reciprocal obligation to protect the property thus committed to him, and for the comfortable support of himself and family. This idea accords with the proof, and harmonizes with the uniform conduct of the parties, which may be considered a just exponent of the understanding which obtained between them. We are therefore of opinion, that the chancellor erred in decreeing an account to be taken of the crop of 1843,

and in charging the plaintiff in error with any portion of the proceeds.

This arrangement however ceased upon the death of Richard, and if Ransom kept the property, and appropriated it to his own use after that period, he was bound for its reasonable hire, which may be decreed under the prayer for general relief.

In respect to the alledged gift of the eight slaves named in the bill, to the children of Ransom G. Hunley, it is most apparent from the proof, that an essential ingredient is wanting to consummate the gift, namely, the delivery of the property. It is true, Ransom may have had these young negroes, like the older ones, under his control, but this possession was not the possession of his children. *There is no evidence that they were ever delivered to him for any such purpose.* Indeed, there is not the slightest evidence of any delivery of these slaves, unless we are to infer such fact from the declarations of the donor, "that *he had given* the slaves to the children of Ransom." Such declarations cannot constitute a valid gift, in the absence of proof of actual delivery. Such was the decision of this court in ₗSewell, by his next friend, v. Glidden, 1 Ala. Rep. 52; and which has been followed by several subsequent decisions. See Sims, &c. v. Sims's Adm'r, 2 Ala. Rep. 117; Blakey, Adm'r, v. The Heirs of Blakey, 9 Ib. 391; Philips v. McGrew, 13 Ib. 255. That Richard Hunley, as well as his wife, the complainant, may at one time have supposed the gift to have been valid, is more than probable from their declarations, but whatever may have been their views respecting its validity, the donor retained the *locus penitentiae* until it was consummated either by the execution and delivery of a deed of gift, or the actual delivery of the slaves to the donees, or their guardian. It moreover satisfactorily appears, that the donor, before his decease, was apprised of the incomplete character of the gift, and the slaves are found in his possession at his death. Under all the circumstances of this case, and the proof which this record contains, we feel perfectly certain that no valid gift at common law was made of the slaves, and that the chancellor decided correctly, in decreeing they should be ac-

counted for as a portion of the assets of the estate of Richard Hunley, deceased.

The counsel for the plaintiff in error is mistaken in supposing the doctrine of estoppel can be applied to the declarations of Lucy Hunley, that her late husband had given the slaves, &c. To give such effect to the admission, the party making it must derive some advantage, or gain some object thereby. The opposite party must be induced to act upon it, or receive some injury in consequence of trusting to its truth. Such is not the case before us; it is very certain such declarations could not justify Caroline Hunley in seizing by force upon the slaves and taking them from Lucy Hunley's possession.

For the error, however, in decreeing an account for the crop of 1843, the decree must be reversed and the cause remanded.