# Marsh's Administrator *et al. v.* Richardson's Administrator.

*Bill in Equity, to set aside Assignments of Distributive Interests, and remove Settlement of Decedent's Estate from Probate Court.*

1. *Misjoinder and multifariousness.* — When a bill seeks to set aside, on the ground of fraud in its procurement, an assignment by a distributee of his distributive interest in a decedent's estate, the distributee and the assignee are the only proper parties; and if other distributees, who have made separate assignments of their distributive interests, to another person, are joined as complainants, and the bill seeks to set aside these assignments also, and to remove the settlement of the es-

[Marsh's Administrator v. Richardson's Administrator.]

tate from the Probate into the Chancery Court, it is demurrable for misjoinder of parties, and also for multifariousness.

2. *Decedent's estate; removal of settlement from Probate into Chancery Court.* — The settlement of a decedent's estate cannot be removed from the Probate, into the Chancery Court, on a bill filed by some of the distributees, which seeks to set aside, on the ground of fraud, assignments of their respective distributive interests, made at different times and to different persons, but does not complain of the administrator's management of the estate, nor of any action of the Probate Court in reference to it, and does not show any reason why that court cannot do full justice to all the parties.

3. *Bequest for " use, benefit, and maintenance " of slaves in* 1857. — A specific bequest of a negro woman and her five children, coupled with a general residuary bequest to the same legatee, " for the use, benefit, and maintenance of the six above-bequeathed servants," was not forbidden by any statute, constitutional provision, or fixed public policy of this State, in 1857.

APPEAL from the Chancery Court of Dallas.
Heard before the Hon. CHARLES TURNER.

JOHN WHITE, for appellants.

FELLOWS & JOHN, contra.

PETERS, C. J. — This is a bill stating a case on fraud committed by Alfred H. Marsh in procuring the assignment of Allen Richardson's distributive interest in his brother's estate, made on the 9th day of February, 1861. This contract of assignment is in writing, and it is executed by Richardson and Marsh only; and none of the other complainants or defendants named in the bill are interested in it, or bound by it. Among other things, the bill is filed to have this assignment set aside, and to relieve Richardson from its operation, on account of fraud committed by Marsh in procuring it. In such a suit, only Richardson is the proper party complainant, and Marsh is the proper party defendant, or, in case of his death, his personal representative. Yet three of Richardson's sisters, who are equal distributees of his brother's estate, and who made like assignments of their separate distributive shares in said estate to Henry B. Elliot, in which neither Richardson (the complainant) nor Marsh joined, or had any interest, are also made co-complainants with Richardson ; and Elliot, who is dead, by his personal representative, and all the distributees of the estate to be divided are made co-defendants with Marsh, by his personal representative, and also John White, the administrator *de bonis non* of the estate of John Richardson, deceased, whose estate is to be divided ; and White & Portis, as attorneys, who hold some of the funds of this estate, are also made parties defendant. The relief asked against Elliot is the same as that asked against Marsh, that is, to have the assignments to Elliot set aside for fraud perpetrated by Elliot in procuring them ; and the fraud imputed to

Elliot is not in any manner connected with Marsh, but it is an independent and wholly separate affair. And in the amended bill these are made to rest upon grounds of avoidance quite different from those asserted in the original bill, that is, the coverture of Mrs. Davidson and Mrs. Williams, and the mental incompetency of Rebecca Richardson. There is no case made against White, the representative of John Richardson, deceased, and none against White & Portis, as attorneys at law, and none against any of the defendants, except Marsh and Elliot, who are dead, and represented by their administrators. White, in his answer, as the representative of the estate of John Richardson, deceased, demurs to the bill for want of equity. White & Portis put in a like demurrer, and White also demurs to the bill as the representative of the estate of Elliot; and the representative of Marsh, who is dead, does the same. Willis P. King, who is the executor of the will of John Richardson, deceased, and the principal legatee, is also made a defendant, but only in his personal capacity. On the hearing of the demurrers, the court overruled them, and proceeded to a final decree against the representatives of the estates of Elliot and Marsh, by which the assignments to Elliot and Marsh are declared void, and cancelled, and the Chancery Court assumes jurisdiction of the administration of the estate of John Richardson, deceased. Upon appeal from this decree, by the representatives of the estates of said John Richardson, deceased, and Elliot and Marsh, this decree is impeached in this court for error.

1. There is clearly a misjoinder of parties complainant in this bill. There is no privity of contract or estate between Marsh and Elliot, or between Allen Richardson and the other complainants. This is apparent on the face of the bill. Such a misjoinder is fatal on demurrer. 2 Ala. 406; 9 Port. 697; 6 Ala. 303; 20 Ala. 426; 9 Ala. 351; 34 Ala. 437; Story's Eq. Pl. §§ 227, 231. The bill in this suit is also multifarious. It unites demands of several matters of a distinct and independent nature against the defendants who represent Elliot and Marsh. In such a case, the court of its own accord may dismiss the bill, if there is a demurrer. Story's Eq. Pl. § 271, and notes.

2. Besides this, there is no ground stated in the bill which would authorize the cause to be withdrawn from the jurisdiction of the Probate Court, and transfer it to a Court of Chancery. There is no complaint of the action of that court, and no complaint of the representative of John Richardson, deceased, in his management of the estate to be distributed; and the administrator does not ask the aid of the Chancery Court, to enable him to administer his trust. If the assignments complained of

[Marsh's Administrator *v.* Richardson's Administrator.]

are fraudulent, they are void ; and this can be as well shown in a Court of Probate as in a Court of Chancery. Without going into the other questions raised in the assignment of errors, the bill should have been dismissed on the demurrers of White, interposed in his answers ; and the court erred in failing to do so.

3. The present cause cannot proceed in its present shape, without a disregard of the long established rules of equity pleading, which have been repeatedly sanctioned by the judgment of this court. 1 Brickell's Dig. p. 750, ch. xxiv. on Parties, *ubique.* But as the present bill will be dismissed without prejudice, in the event of any future suit touching the same matters, it may become necessary to consider the will of John Richardson, deceased, the dispositions of which seem to have been declared void by the rebel Probate Court of Marengo County, in 1861. This judgment of the Probate Court is not made a part of the present proceeding, except by way of recital and reference, so far as I have been able to learn from the record. In case this judgment of nullity of the will was rendered during the interregnum of the legal government in the time of the late war, it is not absolutely conclusive, and its accuracy may be inquired into. *Mosely* v. *Tuthill,* 45 Ala. 621. The will in this case was executed and published, as required by law, on the 25th day of August, in the year 1857 ; and on the death of the testator in the same year it went into effect. It was, therefore, not affected by the act of the legislature, entitled "An act to amend the law in relation to the emancipation of slaves," approved on January 25, 1860. Pamph. Acts 1859–1860, p. 28, No. 36, § 5. Nor by the Constitution, which was amended so as to forbid emancipation during the Confederate supremacy. Then did it violate the law, or the fixed public policy of the State, in force at the time it took effect? This depends upon the power of the testator over his property at his death. Chief Justice MARSHALL, speaking of this power, says: "It would seem to be a consequence of the absolute power which a man possesses over his own property, that he may make any disposition of it which does not interfere with the existing rights of others, and such disposition, if fair and real, will be valid. The limitations on this power are those only which are prescribed by law." *Sexton* v. *Wheaton,* 8 Wheat. 222, 242. In a like case, speaking of a will for the manumission of slaves in Tennessee, Justice THOMPSON, of the same court, uses this language: "As a general proposition, it would seem a little extraordinary to contend that the owner of property is not at liberty to renounce his right to it, either absolutely, or in any modified manner he may think proper. Between the owner and his slave it would require the most explicit prohibition by law to restrain the right." *M'Cutchen* v. *Marshall,* 8 Pet. 220, 238. Chief Justice CHILTON,

of this court, referring to the same power, uses like language. He says : " The master (owner), having an unqualified property in his slaves, may dispose of them in any way he pleases, unless restrained by some rule of law, or some fixed policy of state. The *jus disponendi*, or right of disposing of his property, is an inseparable incident to his absolute and unqualified ownership." *Atwood's Heirs* v. *Beck*, 21 Ala. 590, 608. And Doctor Rutherforth, an eminent writer on Natural Law, speaks to the same import. He declares that " Full property in a thing is a perpetual right to use it to any purpose, and dispose of it at pleasure. Property, in the strict notion of it, is such a right to a thing as excludes all persons except the proprietor from all manner of claim upon it. No person, therefore, can, consistently with such a right, take the thing from him at any time, or hinder him in the free use of it, or prevent him from disposing of it as he pleases." Ruth. Nat. Law, pp. 34, 35. These are not exceptional authorities, but they speak the settled doctrine of the courts of highest credit, and the most eminent text writers upon this power. 4 Kent, p. 326, marg. ; Angel on Ass. p. 1.

The will in this case is a brief one. It is in the following words : " I, John Richardson, of Marengo County, State of Alabama, do hereby make this my last will and testament, in manner and form following, that is to say : 1. After the payment of my just debts and funeral expenses, I give to Willis P. King the following named servants, namely, woman Henrietta, boy Nathan Jackson, girl Louisa, boy William, girl Matilda, boy James. 2. I also will and bequeath unto the above named Willis P. King all the rest and residue of my estate, both personal and real, wheresoever or whatsoever kind, for the use, benefit, and maintenance of the six above bequeathed servants, viz. : Henrietta, Nathan Jackson, Louisa, William, Matilda, and James. And lastly, I do hereby constitute and appoint my friend, Willis P. King, executor of this my last will and testament, hereby revoking all other or former wills or testaments by me heretofore made. In witness whereof, I have hereunto set my hand and affixed my seal, this 25th day of August, one thousand eight hundred and fifty-seven.

" JOHN RICHARDSON.    [SEAL.] "

It is very plain to be seen that this instrument does not seek to emancipate any slaves, either directly or indirectly. Nor does it attempt to license them to hire themselves to other persons, or to hire their own time, or to go at large, or to violate any law of the State, or its fixed public policy. Code of Ala. §§ 1005, 2144. But the owner, who is the testator, gives, by his will, certain " servants," as he called them, as slaves to his legatee, to be the property of such legatee, in accordance with

the law and the fixed policy of the State touching such property. Code of Ala. §§ 1589, 1595. He also gives, along with these persons, certain other property to the same legatee, " for the use, benefit, and maintenance " of " the servants " thus given. Was this provision for the " maintenance " of slaves during their lives forbidden by the law or the public policy of the State at that time ? The gift did not in any wise tend to impair or endanger the institution of slavery. It may have been a very proper duty to these persons, which could not have been performed in any other way. Could not property be then given to another person, to feed, clothe, and maintain negro slaves so long as they might live ? This was what the owner was bound to do by the law then in force, during his life. He was bound to treat his slave with humanity, provide him with a sufficiency of healthy food and necessary clothing, cause him to be properly attended during his sickness, and provide for his necessary wants in his old age. Rev. Code, § 2043. The failure to discharge these important duties was an indictable offence. Rev. Code, § 3297.

I am aware of the decisions of this court which declare, that a gift to a slave, or to another to hold for him, is void. *Trotter* v. *Blocker & Wife*, 6 Port. 269 ; *Pool* v. *Harrison*, 18 Ala. 514 ; *Roberson's Heirs* v. *Roberson's Ex'r*, 21 Ala. 273 ; *Carroll & Wife* v. *Brumby, Adm'r*, 13 Ala. 102. But this principle was greatly shaken, if not abandoned, in the case of *Atwood's Heirs* v. *Beck*, 21 Ala. 590, and also the subsequent case of *Abercrombie's Executors* v. *Abercrombie's Heirs*, 27 Ala. 489. But the present case is different from the cases above cited. The provision here was simply an effort to do what the law permitted and required during the testator's life, — that is, " aid and maintain " certain of his slaves after his decease. The learned counsel for the appellees insinuate, in their brief, that the " woman Henrietta " was the wife of the testator, and that the other persons mentioned in his will were his children, and that King, the executor, had married " the mulatto daughter " of this woman and the testator. If this be so (and the respectful language used to designate " Henrietta and her children " in the testament as " servants," and not as " slaves," is calculated to deepen this impression), then, the effort to aid her in her servitude, and to maintain her and her children during their lives, can hardly be denounced as inhumane or unlawful, in one who had shared her bed as the mother of his children, humble and helpless as she might be, before the law and in the eye of the fixed public policy of the State.

The will was, therefore, not void, as declared by the Probate Court. But as this is alleged in the bill in this case, and admitted by the demurrer, this question can have no influence in the present judgment.

The judgment of the court below is reversed, and the bill is dismissed, with costs, but without prejudice.